# Illinois Official Reports

## Appellate Court

---

### *People v. Mabrey*, 2016 IL App (1st) 141359

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TYRONE MABREY, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-14-1359 |
| Rule 23 order filed | September 30, 2016 |
| Rule 23 order withdrawn | October 20, 2016 |
| Opinion filed | November 17, 2016 |
| Rehearing denied | January 17, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 00-CR-18817; the Hon. Arthur F. Hill, Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Chan Woo Yoon, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Michele Grimaldi Stein, Assistant State's Attorneys, of counsel), for the People. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justice Burke concurred in the judgment and opinion.
Presiding Justice Ellis dissented, with opinion.

**OPINION**

¶ 1     Following a jury trial, defendant, Tyrone Mabrey, was convicted of first degree murder in relation to the shooting death of Manuel Jiminez and sentenced to 40 years in prison. In this appeal, defendant challenges the summary dismissal of his *pro se* postconviction petition in which he asserted claims of actual innocence and that his confession had been coerced.

¶ 2     Because the facts relating to defendant's trial are relevant to our resolution of this appeal, we will recite them below. Prior to trial, defendant filed a motion to suppress, and thereafter an amended motion to suppress, in which he alleged that his videotaped confession, which was taken after three days of interrogation, was the product of police coercion. Defendant specifically stated that he had not been informed of his constitutional rights prior to his interviews with the police and that the officers had coerced his confession by telling him "false statements to the effect of 'you will never see your children again'; and 'we will help you make a self-defense statement to present [*sic*] a conviction for first degree murder'; 'you do not need a lawyer, you are not getting a lawyer' and 'go along with the program' or 'you will never be released from custody.'" Defendant's motion also alleged that the detectives "coached" him "as to the content of the statements that they wanted him to tell to the Assistant State's Attorney," and therefore, his statements were involuntary and the introduction of them would violate the fifth and fourteenth amendments of the United States Constitution.

¶ 3     The trial court held a hearing on defendant's motion, at which Detectives Adrian Garcia and Mark Richards and Assistant State's Attorney (ASA) Scott Herbert testified. The witnesses testified consistently that defendant was informed of his *Miranda* rights prior to the interviews, that defendant agreed to speak to them, and that he provided a series of differing alibis as to his whereabouts at the time of the shooting. After police investigated those alibis and found evidence disproving them, defendant confessed. The witnesses denied making the statements that defendant had attributed to them or coaching him as to what to say. They further testified that defendant was fed and allowed to use the bathroom during the time he was in custody. Defendant did not testify at the hearing and presented no witnesses.

¶ 4     The trial court denied defendant's motion, finding that the witnesses were "credible, they were logical, they were internally consistent with each other, they were unimpeached and the video statement also corroborates their testimony." The trial court further found that defendant "was properly advised of his rights," "was not denied any necessities," "was not threatened or coerced in any way," and was not "refused an attorney."

¶ 5     Immediately thereafter, the court took up the State's motion to introduce proof of other crimes. The State specifically requested that it be allowed to introduce prior convictions relating to defendant's sale of drugs at the corner of Ohio Street and Springfield Avenue, where the murder occurred. The State contended that proof of other crimes was relevant as to defendant's identity, as it showed that defendant frequented that corner, and as to motive,

because it showed that defendant had "a lucrative drug business that need[ed] to be protected." Defense counsel initially maintained that identification would be an issue in the case, as the defense would be "alibi in the sense that he was not there. Hopefully I'll be able to bring somebody in to show where he was when it occurred, which is not going to be the scene here." However, after speaking with defendant, defense counsel retreated from that position, and stated, "Let me correct myself, Judge. An identification is not going to be an issue, Judge, it's not going to be an alibi. The defendant will testify or evidence will show that he was in the vicinity of that alley, he was there, but was not the shooter." The court asked defense counsel, "Let me understand, you're asking to strike the alibi defense?" Defense counsel responded, "I am, Judge." The trial court confirmed that defendant had "talked to [his] Attorney about that" and asked if that was "[defendant's] request as well," and defendant responded, "Yes, sir." The court then ruled, "Based on that then the People's motion to introduce proof of other crimes is denied."

¶ 6    The following summary of the trial testimony and evidence is taken from this court's December 1, 2003, Rule 23 order from defendant's direct appeal:

"At trial, Orlando Mastache testified that on July 3, 2000, he and his cousins, including Manuel Jiminez, and several girls watched the fireworks show at the Chicago lakefront. Later that evening, he and Jiminez drove to Ohio and Springfield to buy cocaine.

When they arrived in that area, Mastache and Jiminez drove up to three men near a car in the alley. Defendant walked up to the passenger side of the vehicle, where Jiminez was sitting, and said that he provided '24 hour service.' He then showed Mastache and Jiminez some rock cocaine in a small plastic bag. Mastache took the bag and bit into the substance to verify that it was cocaine. As a police car approached, defendant grabbed the small bag of cocaine and returned to the car which he had previously been standing near.

Mastache and Jiminez drove away from the area, and upon their return, saw defendant talking to someone in a different vehicle. After that vehicle left, defendant walked up to Mastache's car and told Jiminez to get out.

After Jiminez did so, defendant walked over to a tree and picked up something from the ground. Jiminez and defendant were talking about six feet away, but Mastache could not hear what they were saying. Defendant then extended his right arm and shot Jiminez in the stomach. Mastache heard Jiminez yell and saw him fall back into the bushes. Defendant ran away and Mastache drove Jiminez to the hospital.

There, Mastache spoke to detectives and gave them a description of the shooter. On July 5, 2000, Mastache viewed a police lineup and identified [Todd Hill,] one of the men he saw in the alley with defendant when Jiminez was shot. Later the same day, Mastache viewed a second lineup and identified defendant as the shooter.

Detective William Fiedler testified that on July 4, 2000, he and his partner, Detective Mark Richards, were assigned to investigate the shooting of Jiminez. About 9:30 a.m., the detectives went to the area of Springfield and Ohio to locate possible witnesses. After interviewing Andrew Jones, the detectives attempted to locate a white Pontiac Sunbird vehicle.

The following morning, Detective Fiedler observed a white Pontiac Sunbird proceeding across an intersection directly in front of him and drove his police vehicle behind it. The driver sped away and Detective Fiedler pursued this car for several blocks. When it stopped, a man, later identified as Todd Hill, ran from the car holding a handgun in his right hand. The detectives apprehended Hill and recovered the handgun Hill threw under a porch stairwell. At the station, Hill provided the officers with defendant's name as a suspect in the shooting of Jiminez.

Detective Adrian Garcia testified that on July 4, 2000, he was assigned to investigate the shooting of Jiminez. Acting on an anonymous tip received the following day, Detective Garcia and other detectives went to an apartment at 1633 West Madison and arrested defendant inside.

About 7:30 p.m., Detectives Garcia and Matteas interviewed defendant at the police station. Detective Garcia advised defendant of his *Miranda* rights and defendant agreed to answer his questions. Defendant stated that on July 4, 2000, he and a woman named Robin Hayes drove to the area of Ohio and Springfield to purchase marijuana. While purchasing the marijuana, defendant saw a 'Mexican' person nearby. As defendant was driving away from the area, he heard a gunshot. Defendant also provided an address and phone number for Hayes and the detectives subsequently interviewed her.

In his second interview with defendant, Detective Garcia informed defendant that Hayes said she was not with him on the date in question. Defendant then stated that he was not in the area of Ohio and Springfield, but had heard that a 'Mexican' person was shot there because the two men, Loco and Bollo, who sell drugs in that area, thought that he was 'going to rip off the spot.'

On July 6, 2000, Detective Garcia interviewed defendant a third time, and advised him of his *Miranda* rights. Defendant stated that on the date in question, he and a woman named Latrice, also known as Pamela Williams, drove to Ohio and Springfield to purchase marijuana. Defendant got out of his car and saw several people, including a 'Mexican' man, in line to make a purchase. After defendant bought his marijuana, he walked back to his car and heard a gunshot. When he looked back, defendant saw the 'Mexican' man stumbling. Defendant then drove to Williams' home and stayed there until about 4 a.m., before proceeding to 1633 West Madison to spend the night.

On the following day, July 7, 2000, Detective Garcia interviewed Williams, then spoke with defendant a fourth time. Detective Garcia informed defendant that Williams had told them that she was not with defendant on the date in question.

Detective Mark Richards testified that he advised defendant of his *Miranda* rights and interviewed defendant on July 8, 2000. Following this interview, Detective Richards called the State's Attorney's office and about two hours later, he and Assistant State's Attorney (ASA) Scott Herbert interviewed defendant. ASA Herbert advised defendant of his *Miranda* rights and defendant indicated that he was willing to answer their questions.

In the interview that followed, defendant stated that on July 4, 2000, he was selling narcotics in an alley near Ohio and Springfield when two 'Mexicans' drove up in a car to make a purchase. Defendant gave one of the men some narcotics and the

man bit off a piece of the rock to determine in the substance was as represented. Defendant had noticed that these men had a baseball bat in their car. When a police vehicle approached, the two 'Mexicans' drove away, but returned shortly thereafter to purchase drugs. At that time, defendant retrieved more drugs and a gun hidden nearby, then walked down the alley with Jiminez. Defendant sold Jiminez two rocks of cocaine and Jiminez bit off a piece of the cocaine and began chewing on it. Jiminez began rocking back and forth on his feet with a crazed look, and defendant thought about the baseball bat he had seen in the car. He then pulled out the gun and it went off. Defendant provided a similar version of events in a videotaped statement.

Doctor Mitra Kalelkar, a Cook County medical examiner, testified that she examined Jiminez's body and determined that the cause of death was a gunshot wound to his left upper abdomen. She found a muzzle imprint around the wound and the skin blackened from powder and soot deposits which indicated that the barrel of the gun was in contact with Jiminez's body when it was fired.

The State rested its case and the court denied defendant's motion for a directed verdict. Defense counsel recalled Detective Fiedler, who testified that Mastache had told him that Jiminez and the shooter were about 20 to 40 feet east of his vehicle.

Detective Gayle Maurovich testified that on the morning of July 4, 2000, she interviewed Mastache at the hospital. Mastache stated that he was about 40 to 50 feet away when Jiminez was shot. Detective Maurovich viewed Mastache's vehicle, which contained a baseball bat, stereo unit, a steering wheel lock device and a bottle of beer. Detective Maurovich also examined the area where Jiminez was shot and determined that the closest street light was about 83 feet away." *People v. Mabrey*, No. 1-02-1564 (2003) (unpublished order under Supreme Court Rule 23).

¶ 7 Based on the above evidence, defendant was convicted of first degree murder and sentenced to 40 years' imprisonment. In his 2003 direct appeal before a different panel of this court, defendant contended that the trial court had erred in denying his request for a jury instruction on the lesser included offense of involuntary manslaughter. This court affirmed, finding that the "evidence discloses conduct which cannot be construed as reckless, but rather, intentional acts indicative of murder." *Id.*

¶ 8 On January 9, 2014, defendant filed a *pro se* petition for postconviction relief in which he asserted that he was actually innocent and that the murder was committed by Todd Hill, the man who had been arrested the day after the murder in a vehicle matching the one described by witnesses and who had unsuccessfully attempted to dispose of the murder weapon. Defendant supported his petition with his own unsigned statement, which he labeled an affidavit, and affidavits from Style Spivey and Dorthea Maybra. Defendant contended that these affidavits proved that "Todd Hill *** was the gunman who shot and killed Manuel Jiminez and that when the fatal shot rang out, Petitioner was nowhere near the scene." Defendant also contended that there was another witness, Gerrod McCullough, who would verify his account, but he had not been able to obtain an affidavit from him because "I am incarcerated and indigent and unable to locate Gerrod McCullough['s] current address without assistance from the court."

¶ 9 In defendant's petition and "affidavit," he provided a new account of the murder. Defendant claimed that he sold drugs for Hill, and in the early morning hours of July 4, 2000, defendant was with Hill and Hill's friend McCullough, a.k.a. "Money," on the 600 block of

North Springfield Avenue. Defendant and Hill were "discussing a cocaine transaction" with Mastache and Jiminez when police pulled up and "told everyone to go home." Hill told defendant that he was "going to shut down for the night" because the police would come back. Defendant gave Hill "his money and drug's [*sic*] back to him" and asked McCullough for a ride home. The next day, between 11:30 and 11:45 a.m., defendant returned to Springfield Avenue and Ohio Street and spoke with Hill. Hill told defendant that he could "chill," because "the police will be hot today." Hill said that he "had to put in some work last night, so stay off the block until I tell you it's cool." Defendant understood this to mean that Hill had "just shot someone."

¶ 10    The next day, on July 5, 2000, between 5 and 5:30 p.m., defendant was taken into police custody, placed in an interrogation room, and questioned about "a murder for almost 75 hour's [*sic*]." Defendant explained that he "made multiple statements because [he] was scared to say Todd might have did [*sic*] this, because a day earlier Todd told me he put in some work last night. So stay off the block. I understood that as he just shot someone."

¶ 11    Defendant stated that the "whole time [he] was in the interrogation room, [he] was handcuff[ed] to a ring coming out the wall." He had to "sit on the floor" while he had "one wrist handcuff[ed] to the ring." When police came in to question him, defendant was placed in a chair with his hands cuffed behind his back. Defendant further stated that he was only allowed to use the bathroom "when they wanted to question [him]." Defendant stated that Detectives Garcia and Matteas told him that he "was the one that did this crime," but defendant told them that he owned a "380 handgun" not a "357 handgun," and "if [they] wanted to test [his] gun, it's at [his] aunt Dorthea Maybra apartment." Later, an ASA and an officer told defendant "there was know [*sic*] gun at my Aunt apartment."

¶ 12    Defendant further stated that detectives were trying to get him "to sign a statement they prepared or take a polygraph test in order to eat" and that the first time he was given anything to eat was on July 8, 2000, when he gave the videotaped statement. An ASA also told defendant that if he did not confess, "he will charge [defendant's] aunt with accessory to murder and with the gun that was found at her apartment."

¶ 13    Defendant stated that he told the ASA and a police officer that "the victim fell on [him] and the gun just went off," but the ASA told defendant that he could "do better th[a]n that." Defendant then gave "another statement" and the ASA said "we are on the right track." The ASA told defendant that he could "mention the bat in [his] statement" to help him "get involuntary manslaughter" based on defendant feeling threatened. The ASA also told defendant that he could say that Jiminez was "coming toward [him] and the gun just went off."

¶ 14    Defendant said that he was "set to testify at trial" as to the police coercion and Hill's "involvement in the shooting," but Hill "coerced him through threats of having Vice Lords in the Cook County Jail assault or kill him."

¶ 15    Defendant also attached an affidavit from Style Spivey. Spivey averred that:
        "[o]n or about March of 2006, I was on the 600 block of North Springfield in Chicago Illinois, where I lived for over twenty years.
            I seen someone I was familiar with name Todd Hill. Where I recalled a conversation we had and he expressed to me how he regretted getting Tyrone Mabrey A.K.A. Frank as he was known by to take the fall for something he didn't do. I ask

- 6 -

Todd what happen, and what was he talking about. And Todd told me that Frank was locked up for a murder he committed back in the year of 2000. And he blamed Frank for this crime. I was sent to Stateville Corr Cntr in Joliet Illinois in 2013 where I was housed in Unit E, as were Frank. And I told Frank what Todd had told me about what he had done back in 2000 which he was locked up for." (*Sic* throughout.)

¶ 16 Defendant's aunt, Dorthea Maybra averred,

"1. On July 5 2000 police officers came to my apartment at 1633 W Madison Apt 509 around 5:30 pm. And they took my nephew Tyrone Mabrey into custody.

2. Later that evening approx between 7:00 pm and 7:30 pm. The police came back to my apartment for a gun. They left my apartment with a gun." (*Sic* throughout.)

¶ 17 On March 10, 2014, the circuit court entered a written order summarily dismissing defendant's petition as frivolous and patently without merit. The court found that defendant's proposed evidence did not qualify as newly discovered because "as petitioner himself explains, petitioner knew that Todd Hill committed the crime at the time of his arrest and trial." The court observed that the affidavit was comprised of hearsay, which would not be admissible at trial, but even without that affidavit, defendant did not exercise due diligence because he "could have told his attorney that he knew Hill committed the crime so that his attorney could investigate the claim and attempt to demonstrate [it] at trial." The circuit court further found that Spivey's affidavit was not of such a conclusive character that it would probably change the result on retrial because it was an inadmissible hearsay statement, and even if it were admitted, it would be directly rebutted by defendant's videotaped confession and Mastache's testimony identifying defendant as the shooter. The court additionally found that defendant's claim regarding police coercion was waived because he had not raised it previously and defendant had not submitted any new evidence of coercion to support his claim.

¶ 18 Defendant appeals the summary dismissal of his postconviction petition, alleging that he presented arguable claims of actual innocence and that his confession was coerced. The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) provides a mechanism by which a criminal defendant may assert that his conviction was the result of a substantial denial of his constitutional rights. *People v. Delton*, 227 Ill. 2d 247, 253 (2008). At the first stage in the postconviction process, the trial court reviews the defendant's petition on its own, without input from the parties. *People v. Brown*, 236 Ill. 2d 175, 184, (2010). During this stage, the trial court may review the court file, the transcripts, and any appellate court actions. *Id.*

¶ 19 A postconviction petition may be summarily dismissed within 90 days of filing if the court finds it frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2012). While a petition should not be summarily dismissed unless it has no arguable basis in law or fact, a petition at this first stage must provide sufficient factual basis to show that its allegations are capable of objective or independent corroboration. *People v. Allen*, 2015 IL 113135, ¶¶ 24-25. "In the review of a first- or second-stage postconviction petition, 'all well-pleaded facts in the petition and affidavits are to be taken as true, but nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient.' " *People v. Barnslater*, 373 Ill. App. 3d 512, 519 (2007) (quoting *People v. Rissley*, 206 Ill. 2d 403, 412 (2003)). Well-pled factual allegations in a petition and its supporting evidence must be taken as true unless they are positively rebutted by the record. *People v. Sanders*, 2016 IL 118123,

¶ 48. Although defendant need only set forth the "gist" of a constitutional claim at this stage (*People v. Edwards*, 197 Ill. 2d 239, 244 (2001)), section 122-2 of the Act requires that the petitioner clearly set forth the respects in which his constitutional rights were violated and attach affidavits, records, or other evidence supporting the allegations or an explanation for their absence (725 ILCS 5/122-2 (West 2010); *People v. Hodges*, 234 Ill. 2d 1, 10 (2009)). We review the summary dismissal of a postconviction petition *de novo. People v. Coleman*, 183 Ill. 2d 366, 388 (1998).

¶ 20    Defendant first contends that the court erred in dismissing his petition because he raised a claim of actual innocence based on newly-discovered evidence, namely, the affidavit of Style Spivey in which he averred that he had a conversation with Hill in which he confessed to the shooting of Jiminez. We note that defendant explicitly relies only on Spivey's affidavit, and not his own statement, to support his actual innocence claim, and as a result, we will consider only Spivey's affidavit on this issue. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008); *People v. Guest*, 166 Ill. 2d 381, 414 (1995).

¶ 21    A *pro se* petition seeking postconviction relief under the Act may be summarily dismissed as "frivolous or *** patently without merit" pursuant to section 122-2.1(a)(2) only if the petition has no arguable basis either in law or in fact. 725 ILCS 5/122-2.1(a)(2) (West 2012). A petition lacks an arguable basis in fact when it is based on a "fanciful factual allegation," which includes allegations that are "fantastic or delusional" or belied by the record. *Hodges*, 234 Ill. 2d at 16-17.

¶ 22    Although defendant now contends that Hill committed the murder, and that defendant was "nowhere near the scene" when the crime occurred, the record shows that defense counsel, and defendant himself, requested to strike his alibi defense before trial, maintaining that he was "in the vicinity" of the crime scene, but that he "was not the shooter." In these circumstances, we find defendant's actual innocence claim to be subject to summary dismissal, as it is belied by the record. *People v. Torres*, 228 Ill. 2d 382, 394 (2008) ("[T]his court has consistently upheld the dismissal of a postconviction petition when the allegations are contradicted by the record from the original trial proceedings.").

¶ 23    We also conclude that defendant failed to set forth an arguable claim of actual innocence that would warrant second stage proceedings. At the first stage of the Act, the evidence supporting an actual innocence claim must be arguably "new, material, noncumulative *** [and] so conclusive it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96; *People v. Edwards*, 2012 IL 111711, ¶ 24. Evidence is new if it was discovered after trial and could not have been discovered earlier through the exercise of due diligence, material if it is relevant and probative of the defendant's innocence, and noncumulative if it adds to the evidence heard at trial. *Coleman*, 2013 IL 113307, ¶ 96. Most importantly, defendant's new evidence must be so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt in light of this evidence. *Sanders*, 2016 IL 118123, ¶ 47. The new evidence must place the trial evidence in a different light and undermine the court's confidence in the factual correctness of the guilty verdict. *Coleman*, 2013 IL 113307, ¶ 97. Actual innocence is not the same as sufficiency of the evidence or reasonable doubt, nor mere impeachment of trial witnesses, but a claim of vindication or exoneration. *Id.*; *People v. House*, 2015 IL App (1st) 110580, ¶¶ 41, 46. An actual innocence claim is "extraordinarily difficult to meet" (*Coleman*, 2013 IL 113307,

¶ 94), and "[c]ourts rarely grant postconviction petitions based on claims of actual innocence." *People v. Wallace*, 2015 IL App (3d) 130489, ¶ 14.

¶ 24    In this case, defendant's actual innocence claim is premised on Spivey's affidavit, in which he claims to have spoken to Hill, who said that defendant had "take[n] the fall for *** a murder [Hill] committed back in the year of 2000."

¶ 25    Assuming without deciding that Spivey's affidavit may be considered arguably new and noncumulative, we conclude that it is not arguable that the evidence contained in the affidavit is of such a conclusive character that it would probably change the result on retrial. See *Sanders*, 2016 IL 118123, ¶ 47 ("[T]he conclusiveness of the new evidence is the most important element of an actual innocence claim." (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996))).

¶ 26    At trial, the State provided substantial and compelling evidence against defendant. First, the State provided the testimony of Mastache, who witnessed the shooting and identified defendant as the shooter. Mastache testified that he observed defendant and had interacted with him earlier on the day of the shooting, when he and Jiminez initially went to buy drugs at an alley at Ohio Street and Springfield Avenue. Mastache testified that he saw three men in the alley at that time, one of whom was defendant, who approached Mastache and Jiminez and spoke to them about purchasing drugs. The drug transaction was interrupted when police arrived, but Mastache saw defendant again later, when the two men returned later to continue the purchase. After the shooting, Mastache spoke to detectives and gave them a description of the shooter. The evidence at trial showed that Mastache viewed a police lineup the day after the shooting and identified Todd Hill—not as the shooter but as someone who he saw in the alley with defendant. Later that day, Mastache viewed a second lineup, during which he identified defendant as the shooter. Mastache identified defendant again in court and never wavered in his identification of defendant as the shooter. The record also shows that the weapon that Detective Fiedler testified that he believed was used in the murder was later found on Todd Hill, one of defendant's admitted associates.

¶ 27    In addition to the above compelling evidence, the State provided evidence of defendant's confession, which was videotaped, and which the jury had an opportunity to observe. This court has also reviewed the videotaped confession, which we find provides persuasive evidence of defendant's guilt. See *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (a confession may be the " 'most probative and damaging evidence that can be admitted' " against a defendant (quoting *Bruton v. United States*, 391 U.S. 123, 139 (1968) (White, J., dissenting, joined by Harlan, J.))); see also *People v. Fillyaw*, 409 Ill. App. 3d 302, 316 (2011) ("A confession is the most powerful piece of evidence the State can offer, and its effect *** is incalculable.").

¶ 28    In that confession, defendant described in detail the events of that evening, which corroborated the account provided by Mastache in many significant respects. Defendant described how he was selling drugs in the alley at Springfield Avenue and Ohio Street with two other men, Todd Hill—who he identified in a photograph—and a man who he knew as "Big Money." When Jiminez and Mastache arrived, defendant spoke to the passenger, who bit off a piece of the rock cocaine during their interaction. Defendant described how a police squad car arrived, and Jiminez and Mastache drove away. After they returned, defendant spoke to the passenger again outside of the vehicle. Defendant gave him two pieces of crack rock, and the passenger took a bite out of one of the rocks again. The passenger "rocked

forward" and defendant thought of the baseball bat he had seen in the men's car, got out his gun from his back pocket, and the gun "went off," shooting Jiminez, who fell to the ground. Defendant looked back as he ran away and saw the driver carrying the passenger back to the car. Defendant also identified a photograph of the gun he used and described how he disposed of the gun after the shooting in the area nearby where he and Todd Hill stored drugs to sell. During the video, defendant also acknowledged his understanding of his rights, that he had been treated well, and that he had been given food to eat and allowed to use the bathroom when needed.

¶ 29  On this "conclusive character" issue, we find our supreme court's decision in *People v. Harris*, 206 Ill. 2d 293, 299-300 (2002), instructive. There, the Supreme Court considered whether the circuit court properly dismissed a defendant's first and second amended postconviction petitions, in which defendant claimed that he was actually innocent based, in part, on the affidavits of two codefendants who stated that defendant was not present at the time of the crime and that they conspired to frame defendant. *Id.* The supreme court affirmed the circuit court's decision to dismiss this claim without an evidentiary hearing, stating that "[b]ased upon the overwhelming evidence of guilt, the affidavits of [the codefendants] are not of such a conclusive character that they would probably change the outcome on retrial." *Id.* at 302.

¶ 30  Given the strong evidence of defendant's guilt outlined above, we similarly conclude that that Spivey's affidavit is not arguably so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt in light of it. See *Sanders*, 2016 IL 118123, ¶ 47. At best, Spivey's affidavit would merely conflict with defendant's confession and Mastache's eyewitness testimony, but it would not arguably exonerate defendant as required for a claim of "actual innocence." *People v. Collier*, 387 Ill. App. 3d 630, 636-37 (2008) (when evidence merely impeaches or contradicts trial testimony, it is not typically of such conclusive character as to justify postconviction relief); *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009) (impeachment of a prosecution witness is an insufficient basis for granting a new trial). As a result, we find no basis for concluding that the affidavit would probably change the result on retrial (*Harris*, 206 Ill. 2d at 301-02) and conclude that defendant failed to set forth an arguable claim of actual innocence requiring further proceedings under the Act.

¶ 31  Although the dissent repeatedly refers to the alleged statement by Hill to Spivey as Hill's "confession," we note that "confession" has a specific legal meaning. According to John H. Wigmore, a confession is "an acknowledgment in express words, by the accused in a criminal case, of the truth of the main fact charged or of some essential part of it." (Emphases omitted.) 3 John Henry Wigmore, Evidence in Trials at Common Law § 821, at 308 (Chadbourn rev. ed. 1970); see also Black's Law Dictionary 293 (7th ed. 1999) ("A criminal suspect's acknowledgment of guilt, usu. in writing and often including details about the crime."). Here, the thrust of Spivey's statement is that Hill told him that defendant "was locked up for a murder he committed back in the year of 2000." Hill is not the accused in a criminal case, his statement was not formalized in writing or otherwise, and he includes no details about the crime. Hill's statement to a third party, Spivey, cannot be appropriately described as a "confession." Under these circumstances, we cannot find Spivey's affidavit recounting the statement, which is the only evidence defendant is relying upon in this appeal, to be arguably so conclusive that it would probably change the result on retrial.

¶ 32    We next turn to defendant's claim that he set forth the gist of a constitutional claim that his confession was obtained as a result of police coercion. He contends that his confession was involuntary based on his "affidavit" which included allegations that he was in custody for three days, that an ASA threatened to charge his aunt with a crime if he did not confess, and that he was not given food or allowed to use the bathroom.

¶ 33    As an initial matter, the State contends that we should not review this issue because it was not presented in defendant's petition. See *People v. Coleman*, 2011 IL App (1st) 091005, ¶ 16 (holding that an appellate attorney has no right to raise any issue on appeal that is not contained in petitioner's postconviction petition). The State acknowledges that defendant included a discussion in his petition regarding police coercion, but contends that "the discussion of the circumstances of his confession was incidental to" his actual innocence claim described above and was not an independent claim.

¶ 34    We reject the State's argument, which is inconsistent with the requirement that a *pro se* petition be given a liberal construction. "Where defendants are acting *pro se*, courts should review their petitions 'with a lenient eye, allowing borderline cases to proceed.' " *People v. Hodges*, 234 Ill. 2d 1, 21 (2009) (quoting *Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir. 1983)). Because most petitions are drafted at the first stage by defendants with little legal knowledge or training, this court views the threshold for survival as low. *Delton*, 227 Ill. 2d at 254; *Torres*, 228 Ill. 2d at 394. A *pro se* defendant need only allege enough facts to make out a claim that is arguably constitutional for purposes of invoking the Act, and the pleading requirements may be met "even if the petition lacks formal legal arguments or citations to legal authority." *Hodges*, 234 Ill. 2d at 9. We thus find that defendant has sufficiently alleged the claim in his petition so that it may be reviewed on appeal.

¶ 35    Nevertheless, we conclude that defendant has forfeited this claim for postconviction review. A postconviction proceeding is not an appeal of the defendant's underlying judgment but, rather, is a collateral attack on the judgment. *People v. Evans*, 186 Ill. 2d 83, 89 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001); *People v. Harris*, 224 Ill. 2d 115, 124 (2007) ("The scope of the [postconviction] proceeding is limited to constitutional matters that have not been, nor could have been, previously adjudicated."). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered forfeited. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010); *People v. Blair*, 215 Ill. 2d 427, 443-47 (2005).

¶ 36    In defendant's postconviction petition, he contends that his confession was obtained through the use of coercive police tactics. Defendant raised the same issue at trial in a motion to suppress his confession, which was denied by the trial court. Defendant could have, but did not, challenge the propriety of the trial court's denial of his motion to suppress on direct appeal. This issue, having been litigated previously, now acts as a bar to defendant's present coerced confession claim raised in his postconviction petition. *Harris*, 224 Ill. 2d at 124.

¶ 37    There are exceptions to the doctrines of *res judicata* and forfeiture that may allow otherwise barred claims to proceed. It has long been held that *res judicata* and forfeiture do not apply where fundamental fairness so requires, where the alleged forfeiture stems from the incompetence of appellate counsel, or where facts relating to the claim do not appear on the face of the original appellate record. *Blair*, 215 Ill. 2d at 450-51. Here, defendant does not

make any argument based on the first two exceptions—based on fundamental fairness or counsel's competence—and focuses exclusively on the third exception—that the facts relating to his claim are outside the record. He contends that the coerced confession claim in his petition should not be subject to *res judicata* because he bases his claim on "different allegations than" were raised in his Amended Motion to Suppress Statements and "supports his claim with newly discovered evidence." Specifically, he claims that the following allegations were "never revealed" to the trial court at the hearing on his motion to suppress: that he was "chained and unfed in a windowless interview room for more than three days" and that "an ASA threatened to charge his aunt, Doretha Maybra, with a crime if he did not confess."

¶ 38    Our review of the record refutes defendant's claims. At the hearing on defendant's motion to suppress his confession, the court heard testimony regarding the conditions of defendant's interrogation. The trial court was well aware of the length of time defendant was in custody and heard testimony regarding the times that defendant was handcuffed and fed.

¶ 39    The only allegation that is arguably "new," in that it was not presented to the trial court, is that an ASA threatened to charge defendant's aunt with a crime if defendant did not confess. However, this allegation is not newly discovered, it is only newly revealed. Our supreme court has recognized "that, in the interests of fundamental fairness, the doctrine of *res judicata* can be relaxed if the defendant presents substantial new evidence." *People v. Patterson*, 192 Ill. 2d 93, 139 (2000). The standards addressing when new evidence is sufficiently substantial so as to relax *res judicata* are the same standards used to determine whether newly discovered evidence should result in a new trial. *Id.*

¶ 40    In this case, defendant presumably knew the facts of his interrogation and the threats that the detectives and ASA had made against him. Although defendant raised a multitude of allegations regarding threats allegedly made to him at the trial court during the hearing on his motion to suppress, he chose not to raise the specific threat regarding his aunt. The forfeiture exception based on facts outside of the original appellate record, is not an invitation for defendants to present incomplete claims at trial, sit back, and if they are unsuccessful, raise the "new" fact in a postconviction petition. We thus find no basis to relax the application of *res judicata* here. See *Barnslater*, 373 Ill. App. 3d at 530.

¶ 41    The only case upon which defendant relies in maintaining that *res judicata* should not bar consideration of his coerced confession claim is *People v. Mengedoht*, 91 Ill. App. 3d 239, 241 (1980). We, however, do not find *Mengedoht* to be supportive of defendant's position, and in fact, find it to be supportive of the result we reach here. In *Mengedoht*, the defendant filed a *pro se* postconviction petition alleging that his confession and later guilty plea were involuntary. Defendant acknowledged that most of his allegations regarding police coercion of his confession had been previously raised at trial in a motion to suppress his statement. Defendant raised one allegation, however, that had not been included in his motion at trial—that he was twice denied an opportunity to phone his father during the course of the interrogation. The defendant maintained that he had informed his counsel of this allegation and that counsel told him that he would bring it up at the suppression hearing but then failed to do so. The Second District Appellate Court found that defendant was "now precluded from challenging the validity of the confession or guilty plea" under *res judicata*. The court found, however, that *res judicata* did not bar the consideration of whether defense counsel's failure

to include the allegation constituted ineffective assistance of counsel because it was based on facts outside the record on direct appeal.

¶ 42    In this case, defendant maintains that his "new allegations" of police coercion warrant the reconsideration of the voluntariness of his confession. This, however, is precisely the argument that was rejected in *Mengedoht*. Defendant does not contend that his counsel's ineffectiveness prevented him from raising the allegations, and we thus find no reason to conclude that *res judicata* does not apply to his coerced confession claim.

¶ 43    Defendant further contends that "his own averment that Todd Hill's threats prevented him from exposing the detective's coercive interrogation techniques" is new evidence supporting his coerced confession claim. He alleges that he "could not counter the detectives' and ASA's testimony at trial that he was treated well because Hill had warned him not to testify." Defendant's claim is belied by the record on appeal. At trial, defendant was admonished by the court that the choice to testify was his, and his alone. After questioning by the trial court, defendant stated that no one had threatened or forced him not to testify, and no one had promised him anything to not testify. The trial court then accepted defendant's choice to not testify as knowing and voluntary. In these circumstances, we find defendant's claims that his choice not to testify was due to Hill's threats is affirmatively rebutted by the record. See *People v. Jones*, 144 Ill. 2d 242, 263 (1991) (defendant's acknowledgment in open court, at a plea proceeding, that there were no agreements or promises regarding his sentence served to contradict his postconviction petition assertion that he pleaded guilty in reliance upon an alleged, undisclosed promise by defense counsel regarding sentencing); *Rissley*, 206 Ill. 2d at 454 (defendant's allegations were "totally contradicted by the record of the plea"); *People v. Maury*, 287 Ill. App. 3d 77, 83 (1997) (defendant's declaration in his postconviction petition that his plea was involuntarily entered based on the erroneous advice of trial counsel was directly refuted by the record, which indicated that defendant answered "no" when the circuit court inquired whether any extraneous promises had been made to him).

¶ 44    Defendant's claim is further rebutted by the record which shows that defendant actually did present the theory at trial that Hill was responsible for the murder. In defense counsel's opening statement, he focused on how the police had caught "someone else" "running away with a gun." Defense counsel extensively cross-examined Detective Fiedler regarding how Hill was the only person found in the car and who was in possession of the gun. Counsel attempted to ask if the police had ever "run a criminal background on Todd Hill" but that question was objected to and sustained. Counsel further elicited testimony that Hill was not charged for possessing the gun, and was released from custody after giving defendant's name. Defense counsel also requested to "exhibit Mr. Todd Hill physically to the jury." The record indicates that Hill was physically present in the courthouse lockup at the time, having been writted in from the penitentiary for this particular purpose. However, the court, in its discretion, denied the defense's request to present Hill. In closing argument, defense counsel argued that Hill was "Mr. Lucky" who "happened to have this gun." Counsel argued that Hill "got the break of his life" when he "walked out of that police station" and "wasn't charged with anything" even though he "told the police he was a drug dealer" and had "a loaded gun used in a murder." Given the foregoing attention given to Hill by defense counsel, we find defendant's claim that he was threatened by Hill and could not implicate him to be belied by the record. It strains credulity to suggest that defendant was afraid of Hill under the

circumstances presented above. We thus conclude that the circuit court properly held that defendant had failed to present any new evidence which would allow for the reconsideration of whether his confession had been coerced.

¶ 45    Based on the foregoing, we find no error in the summary dismissal of defendant's postconviction petition. Accordingly, the judgment of the circuit court is affirmed.

¶ 46    Affirmed.

¶ 47    PRESIDING JUSTICE ELLIS, dissenting.

¶ 48    I respectfully dissent from the majority's conclusion that defendant failed to state the gist of a claim of actual innocence. When taken as true, evidence that Hill confessed to Spivey in 2013 was new evidence that would at least arguably be likely to change the result on retrial.

¶ 49    The majority opines that the evidence of Hill's confession would be unlikely to change the result on retrial because it "would, at best, merely conflict with defendant's confession and Mastache's eyewitness testimony." The majority sells the likely impact of the confession short. In investigating the shooting, Detective Fiedler heard that Hill was involved. Fiedler arrested Hill in the area of the shooting after Hill fled from the police while *carrying the murder weapon*. It is at least arguable that no rational jury would convict defendant if it heard that Hill—the very same person found in possession of the murder weapon in the area of the shooting—confessed to shooting Jiminez.

¶ 50    The State's other evidence against defendant was not so strong as to moot the potential impact of Hill's confession when it is taken as true. When Mastache saw the shooting, it was dark outside. He testified at trial that he was only 6 feet from the shooting but told the police he was anywhere from 20 to 50 feet or more away.

¶ 51    And although defendant confessed to the shooting, he did so only after being repeatedly interrogated by police over three days and after being told that his statements conflicted with those of other witnesses. In fact, the videotaped statement shown to the jury only consisted of a recitation of defendant's final statement. None of the initial interrogations were shown to the jury. Nor did the jury see the first time defendant confessed to shooting Jiminez. Instead, they saw defendant repeat his statement in response to rehearsed questioning by an assistant State's Attorney. Notably, defendant has maintained his claim that his confession was coerced by the police because of threats they made in response to his earlier statements. While defendant's confession was certainly powerful evidence of his guilt, it was not so conclusive that I can say that a confession by Hill would not at least arguably change the result on retrial.

¶ 52    While Spivey's testimony would contradict the State's evidence of defendant's guilt, the existence of a contradiction does not automatically defeat defendant's claim. If that were so, *any* new evidence of defendant's innocence, no matter how strong, would be insufficient to merit further proceedings, as that evidence would necessarily contradict the State's evidence that defendant was the shooter. And our supreme court has held that evidence which contradicts the State's evidence may be sufficient to show that a different result would be likely on retrial. See, *e.g.*, *People v. Ortiz*, 235 Ill. 2d 319, 337 (2009) (new eyewitness's

testimony was likely to change result on retrial because it "directly contradict[ed] the recanted testimony of the two prosecution witnesses").

¶ 53    The majority cites three cases in support of the notion that Spivey's affidavit is insufficient to show the gist of a claim that defendant's trial would likely be different if Spivey testified: *Ortiz*, 235 Ill. 2d 319, *People v. Harris*, 206 Ill. 2d 293 (2002), and *People v. Collier*, 387 Ill. App. 3d 630 (2008). None of these cases supports the majority's decision.

¶ 54    The majority cites *Ortiz* for the proposition that evidence impeaching a prosecution witness "is an insufficient basis for granting a new trial." But the issue in this case is not whether defendant is entitled to a new trial. Rather, it is whether defendant has stated a claim of actual innocence that is not frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2012).

¶ 55    And in any event, *Ortiz* does not stand for the proposition for which the majority cites it. In *Ortiz*, the defendant was convicted of a murder based on two recanted eyewitness statements. *Ortiz*, 235 Ill. 2d at 323-24. The defendant filed a successive postconviction petition that contained an affidavit from another eyewitness who had seen the beating and shooting of the victim and said that the defendant was not present. *Id.* at 326. After an evidentiary hearing, the trial court found that this new eyewitness's testimony was insufficient to merit a new trial. *Id.* at 327. The Illinois Supreme Court disagreed, holding that the new eyewitness's testimony was likely to change the result on retrial because it contradicted the State's evidence and there was no physical evidence linking the defendant to the crime. *Id.* at 337. The court did not find that defendant could meet that standard only by conclusively proving his innocence; it held that he met it because, "at retrial, the evidence of [the] defendant's innocence would be stronger when weighed against the recanted statements of the State's eyewitnesses." *Id.*

¶ 56    If anything, *Ortiz* supports the notion that defendant's petition should be advanced to second-stage proceedings. Like the new evidence in *Ortiz*, the evidence of Hill's confession would contradict the State's evidence and corroborate defendant's evidence that Hill was the shooter. Taken as true, Hill's confession to Spivey would arguably make the evidence of defendant's innocence stronger than the State's lone eyewitness identification and defendant's confession.

¶ 57    The proposition for which the majority cites *Ortiz* is actually found in a portion of *Ortiz* where the supreme court discussed a different case: *People v. Smith*, 177 Ill. 2d 53 (1997). But *Smith* involved a trial court's decision to deny defendant's motion for a new trial, not a first-stage, *pro se* postconviction petition. *Smith*, 177 Ill. 2d at 82-83. Thus, the supreme court in *Smith* was not called on to decide whether the defendant had met the low bar for first-stage postconviction claims.

¶ 58    Moreover, *Smith* did not involve evidence of a confession by a person identified at trial as the possible murderer. Rather, the defendant in *Smith* filed a posttrial motion with affidavits from nine individuals who said that the codefendant, who had testified at trial that she helped defendant find someone to kill the victim for the defendant, had said that the defendant was not involved in the murder. *Id.* at 82. But the defendant had already presented testimony at trial recounting the same evidence. *Id.* at 84-85. Thus, the supreme court concluded that the trial court did not abuse its discretion in finding that the new evidence would be merely cumulative. *Id.* In this case, evidence of Hill's confession would not be cumulative because it

would add new evidence supporting defendant's theory. No one at trial testified that Hill had confessed before.

¶ 59    The majority also cites *Harris*, 206 Ill. 2d at 301-02, but that case involved two affidavits of witnesses recanting their statements to the police. This case does not involve mere recantation testimony; it involves additional evidence that Hill may have been the actual shooter. Moreover, the court in *Harris* was reviewing whether the defendant had made out a "substantial showing" of a constitutional violation at the second stage of the postconviction proceeding (*id.* at 300), not whether he stated the "gist" of a claim at the first stage. Compare *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006) (at second stage of postconviction proceeding, defendant "bears the burden of making a substantial showing of a constitutional violation"), with *People v. Allen*, 2015 IL 113135, ¶ 24 (if postconviction petition "alleges sufficient facts to state the gist of a constitutional claim *** first-stage dismissal is inappropriate").

¶ 60    Finally, the majority cites *Collier*, 387 Ill. App. 3d at 632, but that case also involved recantation affidavits, not evidence that someone else confessed to the murder for which the defendant had been convicted. And neither of the affidavits in *Collier* said that the defendant did *not* kill the victim; they simply said that the witnesses had fabricated their testimony. *Id.* Here, Hill's confession, taken as true, would show both that defendant did not kill Jiminez and that Hill did. Moreover, *Collier* involved a successive postconviction petition (*id.* at 631), not an initial, first-stage petition, like defendant's.

¶ 61    The majority notes that evidence supporting an actual innocence claim must be exonerating but neglects to point out that, at this stage, defendant does not have to prove his innocence. Rather, he must simply show that it is *arguable—i.e.*, not fanciful, fantastic, delusional, or completely contradicted by the record (*People v. Hodges*, 234 Ill. 2d 1, 16-17 (2009))—that " 'all of the facts and surrounding circumstances *** should be scrutinized more closely to determine [defendant's] guilt or innocence.' " *Ortiz*, 235 Ill. 2d at 337 (quoting *People v. Molstad*, 101 Ill. 2d 128, 136 (1984)). I do not believe that a confession to the crime by an individual who was at the scene of the murder, who was later apprehended with the murder weapon in his possession, and whom the defense identified all along as the real killer, can be brushed aside as " 'fantastic or delusional.' " *Allen*, 2015 IL 113135, ¶ 25 (quoting *Hodges*, 234 Ill. 2d at 17).

¶ 62    The majority also contends that defendant's claims are rebutted by the record, meaning that they were insufficient to warrant further proceedings. The majority's basis for that conclusion is that defendant withdrew his alibi defense because defendant was "in the vicinity of that alley." According to the majority, this shows that defendant's story in his postconviction petition differs from his theory at trial.

¶ 63    I fail to see how counsel's strategic choice of a defense could possibly contradict defendant's recounting of the July 4, 2000, events in his petition. It was not as though defendant testified that he was present for the shooting at trial. Instead, he merely agreed with his attorney's decision to withdraw the alibi defense so that the State would not introduce evidence of defendant's prior drug deals in the alley. The majority's reading of the record and the petition is far too strict for the first stage of postconviction proceedings. See *Hodges*, 234 Ill. 2d at 21 (a "strict construction" of a postconviction petition at the first stage "is inconsistent with the requirement that a *pro se* petition be given a liberal construction").

¶ 64    I cannot say that defendant has failed to meet the low bar set at the first stage, where he presented evidence that an individual found near the scene of the crime, carrying the murder weapon, confessed to shooting the victim alone.

¶ 65    I have no idea if Hill's alleged confession to Spivey is genuine, exaggerated, or utterly fictional. Experience tells us that jailhouse confessions are suspect. But we must take this testimony as true at this stage. *People v. Sanders*, 2016 IL 118123, ¶ 42. We are not authorized to evaluate the credibility of Spivey, Hill, or anyone else at this stage. *Id.* ("Credibility determinations may be made only at a third-stage evidentiary hearing" of a successive postconviction proceeding); *People v. Coleman*, 183 Ill. 2d 366, 390-91 (1998) (noting that "factual and credibility determinations will be made at the evidentiary [*i.e.*, third] stage of the [postconviction] proceeding").

¶ 66    How do we know that Spivey's testimony would not be so believable and persuasive that he could convince a fact finder that Hill really did confess to him? We do not know that. We could not possibly know that. And if the fact finder truly found this testimony credible, if the fact finder truly believed that Hill confessed his guilt, can we really say that it is not at least *arguable* that the fact finder's verdict would be different with this new evidence? I do not see how we could.

¶ 67    This case should be advanced to the second stage, where an attorney could consult with defendant, evaluate the record with a more professional eye, review the evidence, and if necessary amend the petition to present the case in a form necessary "*to ensure that the complaints of [defendant] are adequately presented.*" (Emphasis in original.) *People v. Kuehner*, 2015 IL 117695, ¶ 20 (quoting *People v. Suarez*, 224 Ill. 2d 37, 46 (2007)). I think defendant's petition merits that chance. I respectfully dissent.