2022 IL App (1st) 210659-U

No. 1-21-0659

Order filed August 30, 2022

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 18776 |
| | ) | |
| JERMAINE FOOTS, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court's summary dismissal of defendant's *pro se* postconviction petition is affirmed where the issue of defendant's fitness at the time of his trial and sentencing is forfeited and the forfeiture cannot be relaxed where his "new facts" do not constitute newly discovered evidence.

¶ 2 Defendant Jermaine Foots appeals from an order of the circuit court of Cook County summarily dismissing his *pro se* petition for relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). On appeal, defendant contends the court erred when it dismissed his petition because it stated the gist of a constitutional claim that he was unfit at the time of his trial and sentencing. For the reasons below, we affirm.

¶ 3 Following a July 2017 jury trial, defendant was found guilty of being an armed habitual criminal and unlawful use or possession of a weapon by a felon (UUWF). The trial court merged the UUWF charge into the armed habitual criminal offense and sentenced defendant to a term of 10 years' imprisonment.

¶ 4 The evidence presented at trial established that defendant was a passenger inside a vehicle that was stopped by police for a traffic violation. Chicago police officer Israel Gamez approached the passenger side of the stopped vehicle and observed defendant tucking a handgun inside his waistband directly behind his belt buckle. Gamez opened the vehicle's door and ordered defendant out of the vehicle. Defendant exited the vehicle and was immediately handcuffed. When Gamez reached for defendant's waistline, defendant bent over to prevent Gamez from grabbing the gun. Gamez pulled defendant back, straightening him out, and removed a loaded 380 Ruger blue steel handgun from defendant's waistband.

¶ 5 As Gamez recovered the firearm, defendant told the driver of the vehicle, "tell them it's your pull and I was just holding it." Gamez testified that "pull" is street terminology for a handgun. After being transported to the police station and advised of his *Miranda* rights, defendant told police that he would give them three more guns if they would let him go. The State presented stipulations that defendant was previously convicted of a qualifying felony offense for the purpose

of the UUWF offense and was previously convicted of two qualifying offenses for the purpose of the armed habitual criminal offense. The jury found defendant guilty of both offenses.

¶ 6 At sentencing, the State argued in aggravation that defendant had two prior Class 2 felony convictions consisting of a 2012 burglary conviction for which he was sentenced to probation, which he violated, and a 2014 UUWF conviction for which he was sentenced to five years' imprisonment with a recommendation for boot camp. The State argued that defendant continued to violate the law by possessing firearms and requested a substantial prison sentence.

¶ 7 While arguing in mitigation, defense counsel stated that he had visited defendant in jail. Counsel noted that defendant was 25 years old and the father of three young children. Counsel stated that when he asked defendant about his education, defendant told him "directly" that he did not finish high school because of "the way he is" and he got in trouble. Counsel urged the court to recognize that defendant had "a curiosity or intellect" and was an avid reader. Defendant told counsel that he became interested in Christianity and read portions of the Bible, and he asked questions about faith. Counsel had asked defendant where he saw himself in 10 years. Defendant told him that he wanted to get a job, take care of his children, and possibly enter the military. Counsel noted that the presentence investigation report (PSI) indicated that defendant's mother was tragically murdered, and his father died at a young age. Counsel argued that defendant had strong family support, and some of his family members were present in court.

¶ 8 Counsel acknowledged defendant had been in "a lot of trouble" and previously served a five-year prison sentence. He did not participate in the recommended boot camp. Counsel stated that it would not be appropriate to request the minimum prison term of six years due to defendant's criminal background and suggested a sentence of eight years' imprisonment. Counsel argued that

defendant was transforming his life in a positive way by asking questions about faith, reading, and thinking about his future. Counsel stated that defendant no longer wanted to be a burden on his family, but instead, wanted to be a contributor.

¶ 9     Counsel pointed out that the PSI showed defendant had reported that he was diagnosed in 2016 with bipolar disorder and depression while in jail. Defendant had indicated that he was receiving monthly treatment at Cermak Hospital for those conditions and was required to take an unidentified prescription medication daily to stabilize his condition. Defendant further reported that he was not experiencing any emotional or personal problems. He stated that he had a positive outlook for his future and planned to continue his education. Counsel stated that at no time during the proceedings did he sense that defendant had "foggy thinking" or a disability. When counsel had asked defendant about his mental health, defendant told him that it was something he dealt with every day, but he tried to keep to himself and read. Counsel stated that defendant was mindful of his bipolar depression and was doing something about it, which was a positive factor.

¶ 10     The court asked whether defendant was taking any psychotropic medication. Defendant replied that he was taking "Remerons, Buspars and Benadryls." Defendant explained, "[t]hey help me – calm me down." Counsel stated that he did not think defendant was taking psychotropic medication, but "more of an anger management type of drug." The court ordered that defendant be evaluated for fitness to be sentenced and, in retrograde, fitness to stand trial. The court expressly stated, "I don't want this to come back two years from now with some allegations that he was on psychotropic medications. *** I don't think it's affecting him, but I just as soon close this door." Counsel agreed with the court and stated, "just to be clear with the Court and the record, I – at no times did I question any fitness."

¶ 11   Following several months of continuances, the sentencing hearing resumed. The trial court discussed multiple reports it received from doctors who evaluated defendant and found him fit to stand trial at the time of his trial and fit for sentencing. In a letter to the court dated October 6, 2017, Dr. Kristin Schoenbach, a clinical psychologist with Forensic Clinical Services, reported that she examined defendant on September 8, 2017, regarding his fitness to stand trial, retrograde, and his fitness for sentencing. Based on her examination of defendant and review of the available records, Schoenbach opined as follows:

"Mr. Foots would have been fit to stand trial at the time of his trial and is fit for sentencing. He was minimally cooperative with the evaluation, providing vague and incomplete responses to questions. He refused to answer most fitness-related questions, often responding with "I don't know" or "I don't remember." Despite his lack of cooperation, he manifested no symptoms of a psychiatric condition. Rather, his behaviors during the present evaluation appeared volitional in nature and are not consistent with the manifestation of any mental illness. A review of his treatment records from Cermak Health Services additionally indicate that he has been free of signs or symptoms of a significant psychiatric disorder during the length of his incarceration. It is my clinical opinion that Mr. Foots is not suffering from any psychiatric symptoms that would preclude his fitness. Records indicate that Mr. Foots is currently prescribed psychotropic medications. He will be referred to a staff psychiatrist."

Schoenbach directed the court to refer to her Psychological Summary report for the basis of her opinion. The report is not included in the record.

¶ 12    In a letter to the court dated October 20, 2017, Dr. Sarah Anderson, a staff psychiatrist with Forensic Clinical Services, reported that she examined defendant on October 12, 2017, and reviewed the pertinent records. Anderson opined as follows:

"it is my opinion that Mr. Foots is not reporting or exhibiting signs of symptoms consistent with mental illness or cognitive impairment that would preclude his fitness for sentencing. Additionally, there is no evidence in the medical records that he has exhibited signs or symptoms of a psychiatric disorder during the tenure of his admission to Cermak that would have precluded his retrograde fitness. He additionally is not reporting or exhibiting any side effects of medications that would impact his fitness.

However, due to his lack of participation in the fitness-related portion of the evaluation, I am unable to proffer an opinion, with a reasonable degree of medical and psychiatric certainty, on his retrograde fitness to stand trial with medications or his post-trial fitness to be sentenced."

Anderson referred the court to her full Psychiatric Summary for the basis of her opinions. Anderson's summary is not included in the record.

¶ 13    In a letter to the court dated November 21, 2017, Schoenbach stated that she again examined defendant on November 17, 2017, for his fitness to stand trial retrograde and his fitness for sentencing. Schoenbach's findings were substantially the same as those in her October 6 letter, quoted above. In addition, she opined that her "thorough review" of defendant's treatment records from Cermak Health Services gave "no indication that he has evidenced any cognitive impairment during his incarceration." Schoenbach further stated, "*results from objective psychological testing are strongly indicative of malingering*. As such, it is my clinical impression that his behaviors

during the present evaluation were volitional in nature and not the result of a mental illness or cognitive impairment." (Emphasis in original.)

¶ 14    Schoenbach stated that, despite defendant's lack of cooperation, she concluded that he was not suffering from any psychiatric symptoms that would preclude his fitness for sentencing, and her thorough review of his records revealed "*no evidence of any psychiatric symptoms that would have precluded his fitness at the time of his trial.*" (Emphasis in original.) She again noted that defendant's records indicated he was prescribed psychotropic medications, and he would again be referred to a staff psychiatrist. Schoenbach referred the court to her Psychological Summary, which is not included in the record.

¶ 15    The court noted that it also received a report dated November 29, 2017, from Dr. Nishad Nadkarni, a staff psychiatrist at Forensic Clinical Services, stating that the doctor was unable to render an opinion regarding defendant's fitness due to "defendant's volitional refusal to cooperate with the clinical interview." The court quoted Nadkarni's report which stated, "As he had done during several previous evaluations at Forensic Clinical Services, today Mr. Foots either claim[ed] to have no knowledge or recollection of his legal situation, or he provided misleading information in this regard." The doctor found that defendant's medical records did not indicate any signs or symptoms of major mental illness or cognitive impairment. Nadkarni stated that, based on psychological testing, defendant was malingering such impairments. Nadkarni referred the court to his Psychiatric Summary for the basis of his opinion. Nadkarni's summary is not in the record.

¶ 16    After reading the doctors' reports, the court specifically concluded as follows:

"I wanted to close this door in case it ever became an issue on appeal or any collateral proceedings such as post-conviction matters or possibl[y] any claims of ineffective

assistance of counsel. I am confident based on the doctor's [*sic*] reports that there is no bona fide issue of fitness here. The defendant is fit, not only was fit for trial, is fit for sentencing, and whatever symptoms that [*sic*] being showed are symptoms of malingering, not of any cognitive impairment or major psychiatric illness."

¶ 17    When imposing the sentence, the court stated, "this Court is concerned about the fact that this defendant might have attempted to manipulate the system here, creating psychiatric symptoms that did not exist in order to avoid responsibility or to game the system." The court merged the offenses and sentenced defendant to 10 years in prison for the armed habitual criminal offense.

¶ 18    On direct appeal, defendant argued that his trial counsel rendered ineffective assistance because counsel failed to file a motion to quash arrest and suppress evidence where the police lacked probable cause to arrest him. Defendant also argued that his 10-year sentence was excessive. This court rejected those arguments and affirmed defendant's conviction and sentence. *People v. Foots*, 2020 IL App (1st) 180011-U.

¶ 19    On February 9, 2021, defendant filed the instant *pro se* postconviction petition under the Act. Therein, defendant alleged, *inter alia*, that his trial counsel rendered ineffective assistance because counsel failed to request a fitness hearing to determine if defendant was fit for trial and sentencing. Defendant acknowledged that the trial court found him fit based on the doctors' reports. He asserted, however, that he suffered mental and emotional disabilities and "may" not have been fit at trial. Defendant noted that the court did not determine if he was fit for trial or sentencing with medication. He argued that the court never questioned him about whether he was taking his medication, and, if not, whether that interfered with his ability to communicate with defense counsel or the doctors who attempted to evaluate him. Defendant also stated that he was

taking psychotropic medication during his trial and sentencing, and it impaired his ability to communicate with counsel. He suggested the drugs "may" have affected his cognition and "may" explain his behavior during the evaluations. Defendant stated that he suffered from impaired judgment and problem solving, learning disabilities, and difficulty with focusing and concentrating. He claimed there should have been testimony about whether, in his medicated state, his ability to reason and make judgments about his defense was impaired. Defendant argued that the trial court should have allowed both sides to present evidence regarding his fitness.

¶ 20    Defendant further stated that he attempted suicide while in jail by swallowing "a bunch of pills." He did not report his attempt for fear of being judged and placed on "crisis watch." He claimed his attempt, alone, would have triggered a fitness hearing.

¶ 21    In addition, defendant alleged in his petition that, if counsel would have investigated his mental health, counsel would have discovered defendant was experiencing visual and auditory hallucinations. Defendant stated that he had been hearing voices since he was 13 or 14 years old, and they told him to kill himself. He asserted that the hallucinations warranted a fitness hearing.

¶ 22    Finally, defendant alleged that he was presenting "new evidence" that he was unfit for trial and sentencing. Defendant again discussed his visual and auditory hallucinations. Defendant was adamant that he told trial counsel and the doctors who evaluated him about the hallucinations but claimed "nothing was ever documented." Defendant referred the court to his own affidavit and psychiatric progress notes from the Illinois Department of Corrections (IDOC), both of which he attached to his petition, as his new evidence.

¶ 23    In his affidavit, defendant averred that he was not fit for trial or sentencing because he suffered from mental problems including impaired judgment and problem solving, personality

disorder, learning disabilities, difficulty focusing and concentrating, and the death of his parents. Defendant stated that he was taking psychotropic medication during his trial and sentencing. He also stated that he "attempted suicide by swallowing 50 remrons, 15 Buspars, and 23 Benadryls." He did not tell anyone about his suicide attempt due to his fear of being judged and placed on suicide crisis watch. In addition, defendant averred that he told trial counsel that he had been hearing voices and hallucinating since he was 13 or 14 years old, and he reported the hallucinations to the doctors who evaluated him, but they failed to document that information. The voices told defendant to kill himself when he attempted suicide in jail.

¶ 24    Defendant also attached three psychiatric progress notes from IDOC dated July 26, 2018, July 21, 2020, and September 16, 2020. The first two notes indicate defendant was taking psychotropic medication on the dates those notes were made. The last two notes indicate defendant reported that he was experiencing visual and auditory hallucinations on those dates. The July 21 note further states that defendant reported he had been hearing voices since he was 13 or 14 years old.  It also indicates defendant was taking Buspar, Remeron, and Zoloft and had no side effects.

¶ 25    In addition, defendant included a memorandum of law in support of his postconviction petition. Therein, defendant repeated his allegations and arguments that he was unfit at the time of his trial and sentencing due to his use of psychotropic medication, his attempted suicide, and his visual and auditory hallucinations.[1]

---

[1] On the same date defendant filed his postconviction petition, he also filed a *pro se* petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2020)). Therein, defendant alleged, similar to his postconviction petition, that Schoenbach and Nadkarni failed to document his visual and auditory hallucinations, and had the trial court been aware of them, it would have held a fitness hearing. Defendant attached to his petition his own "declaration" stating those facts, and the same IDOC psychiatric progress notes he attached to his postconviction petition. There is no indication in the record that the circuit court ruled on the section 2-1401 petition, and it is not presently before this court.

¶ 26    The circuit court summarily dismissed defendant's postconviction petition. It noted that a defendant's right to a fitness hearing is purely statutory, and thus, the court's failure to hold a fitness hearing is not an allegation of constitutional magnitude that can serve as a basis for postconviction relief. The court further noted that it was aware that defendant was diagnosed with bipolar disorder and depression in 2016 and that he was taking medication at that time. Consequently, the court found that the information in the psychiatric notes was not newly discovered evidence. The court concluded that all of defendant's allegations were frivolous and patently without merit and summarily dismissed the petition.

¶ 27    On appeal, defendant contends the circuit court erred when it dismissed his petition because it stated the gist of a constitutional claim that he was unfit at the time of his trial and sentencing. Defendant argues that his petition presents "new factual allegations" that: (1) he attempted suicide while awaiting trial but never told anyone; (2) he has been experiencing auditory and visual hallucinations since he was 13 or 14 years old; and (3) he was taking psychotropic medication at the time of his trial and sentencing that impaired his ability to understand the proceedings and communicate with his attorney. Defendant further argues that the trial court was not aware of these factual allegations when it found that there was no *bona fide* doubt of his fitness. Defendant claims that his "new facts" thereby present the gist of a meritorious constitutional claim that his substantive due process rights were violated when he was tried and sentenced while not fit.

¶ 28    The State responds that defendant's claim is forfeited because the trial record was sufficiently developed for defendant to challenge the trial court's fitness finding on direct appeal, but he did not do so. The State further argues that defendant's claim is also barred by *res judicata* because the issue of defendant's fitness for trial and sentencing was raised and already ruled upon

by the trial court. The State asserts that the procedural bars cannot be relaxed in this case because defendant's "new facts" do not constitute newly discovered evidence where all the information was known to defendant at the time of his trial. The State points out that the psychiatric progress notes defendant relies upon were drafted after he was sentenced and in prison and address his diagnoses and medication as of those dates, which is immaterial to the question of his fitness at trial. Alternatively, the State argues that, even if defendant's "new facts" are taken as true, his argument that they rendered him unfit for trial and sentencing is rebutted by the record.

¶ 29    The Act provides a process whereby a prisoner can file a petition asserting that his conviction was the result of a substantial denial of his federal or state constitutional rights. 725 ILCS 5/122-1 (West 2018); *People v. Knapp*, 2020 IL 124992, ¶ 43. We review the circuit court's summary dismissal of defendant's postconviction petition *de novo*. *People v. Hatter*, 2021 IL 125981, ¶ 22. Under this standard, the reviewing court makes its own independent assessment of the allegations and is " 'free to substitute its own judgment for that of the circuit court to formulate the legally correct answer.' " *People v. Edwards*, 197 Ill. 2d 239, 247 (2001) (quoting *People v. Coleman*, 183 Ill. 2d 366, 388 (1998)).

¶ 30    Our supreme court has held that a postconviction petition may be summarily dismissed as frivolous or patently without merit only if it has "no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition lacks such an arguable basis when it is based on fanciful factual allegations or an indisputably meritless legal theory, such as a theory that is completely contradicted by the record. *Id.* At the summary dismissal stage, all well-pled allegations in the petition must be taken as true unless they are contradicted by the record. *Coleman*, 183 Ill. 2d at 381-82.

¶ 31    A postconviction proceeding is not a substitute for a direct appeal but, instead, is a collateral attack upon the conviction that allows only limited review of constitutional claims that could not be raised on direct appeal. *People v. Tate*, 2012 IL 112214, ¶ 8. The doctrine of *res judicata* bars consideration of any issues that were determined on direct appeal, while any issues that could have been raised, but were not, are deemed forfeited. *People v. Blair*, 215 Ill. 2d 427, 443-44 (2005).

¶ 32    In this case, we find that the issue of whether defendant was fit to stand trial and fit for sentencing has been forfeited. The record shows that the issue first arose during the sentencing hearing when it was discovered that the PSI indicated defendant had been diagnosed with bipolar disorder and depression while in jail. Defendant reported he was receiving monthly treatment for those conditions and was required to take prescription medication daily to stabilize his condition. The court asked whether defendant was taking any psychotropic medication. Defendant replied that he was taking "Remerons, Buspars and Benadryls" to help him calm down. The trial court ordered that defendant be evaluated for his fitness to be sentenced and, in retrograde, fitness to stand trial. The court expressly stated, "I don't want this to come back two years from now with some allegations that he was on psychotropic medications. *** I don't think it's affecting him, but I just as soon close this door."

¶ 33    Defense counsel agreed with the court and stated that at no time during the proceedings did he sense that defendant had "foggy thinking" or a disability. Defendant had discussed his mental health with counsel and told him it was something he dealt with every day, but he tried to keep to himself and read. Counsel stated that defendant was mindful of his bipolar depression and was

doing something about it. Counsel further stated, "just to be clear with the Court and the record, I – at no times did I question any fitness."

¶ 34    Over the next several months, defendant was evaluated during four separate examinations by a psychologist and two psychiatrists from Forensic Clinical Services. Each of the doctors reported that defendant was minimally cooperative with the evaluation process and refused to answer most of the fitness-related questions, often responding with "I don't know" or "I don't remember." Despite his lack of cooperation, each of the doctors opined that defendant was not manifesting any symptoms indicative of a psychiatric disorder, mental illness, or cognitive impairment. Instead, they found his behavior volitional in nature. Schoenbach and Nadkarni reported that the results from objective psychological testing strongly indicated defendant was malingering. Schoenbach noted in both of her reports that defendant was taking psychotropic medication. Anderson found that defendant was not reporting or exhibiting any side effects from his medication that would have impacted his fitness. Following each of her examinations of defendant, Schoenbach concluded he was fit at the time of his trial and fit for sentencing.

¶ 35    After reviewing the doctors' reports, the trial court found that there was "no bona fide issue of fitness here." The court explained that it had ordered the evaluations because it "wanted to close this door in case it ever became an issue on appeal or any collateral proceedings such as post-conviction matters or possibl[y] any claims of ineffective assistance of counsel." Accordingly, the court concluded that defendant had been fit for trial and was fit for sentencing.

¶ 36    The record thus reveals that the issue of defendant's fitness for trial and sentencing was thoroughly addressed in the trial court. The doctors, trial court, and defense counsel all concluded that there was no issue or concern regarding defendant's fitness. Defendant could have challenged

the fitness finding on direct appeal but did not. Consequently, the issue has been forfeited. *Blair*, 215 Ill. 2d at 443-44.

¶ 37     Defendant argues that his claim is not forfeited because it is based on "new evidence" that was not presented to the trial court, and thus, did not appear in the record on direct appeal. His new evidence consists of his suicide attempt while in jail, hallucinations since the age of 13 or 14, and his alleged impairment while taking psychotropic medication during trial.

¶ 38     Our supreme court has long held that the procedural bars of forfeiture and *res judicata* do not apply where fundamental fairness so requires, where the alleged forfeiture is due to ineffective assistance from appellate counsel, or where the facts relating to the issue do not appear on the face of the original appellate record. *People v. English*, 2013 IL 112890, ¶ 22. It is the third exception defendant is attempting to apply here. Defendant states that he is not claiming the trial court erred when it found no *bona fide* doubt of his fitness based on the evidence before it at that time. He contends, rather, that if the court had been aware of the new facts when his fitness was being evaluated, it arguably would have found that he was not fit for trial or sentencing.

¶ 39     A procedural bar may be relaxed if defendant presents substantial new evidence in support of his claim. *People v. Mabrey*, 2016 IL App (1st) 141359, ¶ 39 (citing *People v. Patterson*, 192 Ill. 2d 93, 139 (2000)). The standard for determining whether new evidence is sufficiently substantial such that a procedural bar should be relaxed is the same as that used to determine whether newly discovered evidence should result in a new trial. *Id.* Newly discovered evidence is evidence that was discovered after trial and that defendant could not have discovered earlier through the exercise of due diligence. *People v. Robinson*, 2020 IL 123849, ¶ 47. Such evidence must also be material, noncumulative, and of such conclusive character that it would likely change

the prior judgment. *People v. Kraybill*, 2021 IL App (1st) 190621, ¶ 26. In *Mabrey*, this court stated, "[t]he forfeiture exception based on facts outside of the original appellate record, is not an invitation for defendants to present incomplete claims at trial, sit back, and if they are unsuccessful, raise the 'new' fact in a postconviction petition." *Mabrey*, 2016 IL App (1st) 141359, ¶¶ 39-40 (finding the defendant's "new" evidence alleged in his postconviction petition was not newly discovered, but instead, "only newly revealed" where the information was known to defendant prior to trial).

¶ 40      In this case, we find that the three "new facts" defendant alleged in his postconviction petition in support of his claim that he was unfit at trial do not constitute newly discovered evidence. At this stage of the postconviction proceedings, we must take defendant's allegations as true unless they are contradicted by the record. *Coleman*, 183 Ill. 2d at 381-82. Even when we do so, the record shows defendant was aware of his "new evidence" at the time of his trial, but he withheld it and chose to reveal it in his postconviction petition.

¶ 41      Defendant asserts that he attempted suicide by swallowing several pills while he was in jail awaiting trial. In his affidavit, defendant stated that he swallowed "50 remrons, 15 Buspars, and 23 Benadryls." Defendant further stated that he did not report his attempt to anyone for fear of being judged and placed on suicide crisis watch. Although this is a new fact that does not appear in the trial record, it is not newly discovered evidence but, instead, is only newly revealed. Defendant could have reported his suicide attempt to defense counsel or to any of the doctors during his multiple fitness evaluations, but he chose not to do so. Therefore, because his suicide attempt is not newly discovered evidence, it is not substantial new evidence that can be used to relax his forfeiture of the fitness issue. *Mabrey*, 2016 IL App (1st) 141359, ¶ 39.

¶ 42    Defendant further asserts that he has been hearing voices since he was 13 or 14 years old and those voices told him to kill himself, leading to his suicide attempt in jail. He also asserts that he experienced visual hallucinations in addition to the auditory hallucinations. Similar to the suicide attempt, this is a new fact that does not appear in the trial record. However, it again is not newly discovered evidence, but only newly revealed. At the time of his trial, defendant was aware of his hallucinations and his long history of hearing voices.

¶ 43    In his postconviction petition, when defendant alleged ineffective assistance of trial counsel, a claim he has abandoned on appeal, he argued that if counsel would have investigated his mental health, counsel would have discovered defendant was experiencing visual and auditory hallucinations. Yet, later in his petition and in his affidavit, defendant was adamant that he told counsel and the doctors who evaluated him about the hallucinations, and they all failed to document it. Thus, within his petition defendant has contradicted himself regarding counsel's knowledge of his hallucinations.

¶ 44    Moreover, the record contradicts defendant's claim that he reported the hallucinations to the doctors who evaluated him. All the doctors reported that defendant was minimally cooperative with the evaluations and provided vague and incomplete responses to questions. He refused to answer their fitness-related questions, responding with "I don't know" or "I don't remember." The doctors found defendant's behavior volitional and that he was malingering. Schoenbach twice concluded that defendant was not suffering from any psychiatric symptoms that precluded his fitness.

¶ 45    In support of his allegation regarding the hallucinations, defendant attached three psychiatric progress notes reflecting treatment he received in IDOC on July 26, 2018, July 21,

2020, and September 16, 2020. The two notes from 2020 indicate defendant reported he was experiencing visual and auditory hallucinations on those dates. Although the July 21 note indicates defendant reported he had been hearing voices "all [his] life" since the age of 13 or 14, the notes do not specifically address defendant's condition at the time of trial. They are all dated after defendant was sentenced and imprisoned. Therefore, the IDOC notes are immaterial to the question of defendant's fitness at the time of trial.

¶ 46    The record thus shows that defendant's allegation regarding his hallucinations is not newly discovered evidence. Accordingly, his reported hallucinations do not constitute substantial new evidence that can be used to relax his forfeiture of the fitness issue. *Mabrey*, 2016 IL App (1st) 141359, ¶ 39.

¶ 47    Finally, defendant claims he was taking psychotropic medication during his trial and sentencing which impaired his judgment and ability to communicate with counsel. The record shows that this is not a new fact and that it is contradicted by the record. When the issue of defendant's fitness first arose, the trial court asked defendant if he was taking any psychotropic medication. Defendant replied that he was taking "Remerons, Buspars and Benadryls." This led the court to order that defendant be evaluated for fitness to be sentenced and, in retrograde, fitness to stand trial.

¶ 48    The record further reveals that counsel told the court that at no time during the proceedings did he sense that defendant had "foggy thinking" or a disability. Counsel had visited defendant in jail prior to sentencing and they spoke at great length about many factors in defendant's life, including his mental health. The court expressly stated, "I don't want this to come back two years from now with some allegations that he was on psychotropic medications. *** I don't think it's

affecting him, but I just as soon close this door." Counsel agreed with the court and stated, "just to be clear with the Court and the record, I – at no times did I question any fitness." The record thus shows that the court and counsel were aware that defendant was taking psychotropic medication and found it had not inhibited his ability to understand the trial proceedings or communicate with counsel.

¶ 49     Moreover, Schoenbach noted in both of her evaluation reports that defendant was "currently prescribed psychotropic medications." She referred defendant to be evaluated by a psychiatrist. Following a psychiatric evaluation, Anderson stated that defendant was "not reporting or exhibiting any side effects of medications that would impact his fitness." Following the evaluations, the court concluded that it was confident that there was no *bona fide* doubt of defendant's fitness for trial or sentencing.

¶ 50     The record thus shows that defendant's claim that he was taking psychotropic medication during trial that impaired his judgment and ability to communicate with counsel is not newly discovered evidence, but instead, is contradicted by the record. His claim, therefore, does not warrant relaxing his forfeiture of the fitness issue.

¶ 51     For these reasons, we conclude that defendant forfeited his challenge to the trial court's finding that there was no *bona fide* doubt that he was fit to stand trial and fit for sentencing. Furthermore, none of the alleged "new facts" in defendant's postconviction petition constitute newly discovered evidence such that his forfeiture can be relaxed or excused. *Mabrey*, 2016 IL App (1st) 141359, ¶ 39.

¶ 52    Accordingly, the judgment of the circuit court of Cook County summarily dismissing defendant's postconviction petition is affirmed.

¶ 53    Affirmed.