2024 IL App (1st) 211549-U

No. 1-21-1549

Order filed February 8, 2024

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 4056 (02) |
| | ) | |
| DEMETRIUS WARREN, | ) | Honorable |
| | ) | Michael R. Clancy, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Rochford concurred in the judgment; Justice Ocasio specially concurred.

**ORDER**

¶ 1    *Held*:   Circuit court's summary dismissal of defendant's postconviction petition reversed where defendant presented an arguable claim of actual innocence sufficient to advance the entire petition to the second stage of proceedings.

¶ 2    Defendant Demetrius Warren appeals from the summary dismissal of his petition filed

pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). On

appeal, defendant argues that the circuit court erred in dismissing his postconviction petition at the

first stage because he presented arguable claims of actual innocence and ineffective assistance of trial counsel. We reverse.

¶ 3    Following a jury trial, defendant was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2006)), armed robbery (720 ILCS 5/18-2(a)(2) (West 2006)), and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2006)). The charges stemmed from a series of armed robberies and attempted armed robberies on November 18 and 19, 2007, by defendant, then 17 years old, Eric Walker, Benjamin Williams, and Jamal Bracey, which resulted in the death of Amadou Cisse. In this order, we set forth only the evidence relevant to the issues on appeal.

¶ 4    At trial, Kimberly Smith testified that a few days prior to November 19, 2007, Williams and defendant, whom she identified in court, were at her residence. Defendant had a firearm with a white handle in his pants.

¶ 5    Walker testified that he pled guilty to armed robbery in exchange for his testimony and 20 years in prison. On November 18, 2007, he rented a vehicle around 8 p.m. or 9 p.m. While driving, he saw defendant, whom he identified in court, and defendant's friends, Williams, Bracey, and E.[1] Defendant asked Walker to take them to a friend's residence in Hyde Park, and Walker agreed. After defendant entered the vehicle, he placed a black revolver with a white handle in his lap and stated that they would "hit some licks," meaning commit robberies.

¶ 6    They observed a man walking near 60th Street and Woodlawn Avenue, and defendant told Walker to stop the vehicle. Defendant gave E the firearm, and E "jumped out" of the vehicle. The man ran, and E chased him and "fired a shot." E returned to the vehicle, and Walker drove off. They next observed a man standing on the corner near 59th Street or 60th, and defendant instructed

---

[1] E's name is not included in the record on appeal.

Walker to "go down some and let him out." Walker proceeded to the next corner, where defendant exited the vehicle with the firearm. Defendant ran back to the vehicle and stated that the man "had nothing." At approximately 1 a.m. on November 19, 2007, they saw two women walking with bags. Defendant, who hid the firearm on his person, and Bracey exited the vehicle and approached the women. Walker observed them reach for the women's bags and return to the vehicle with credit cards and pens.

¶ 7    Near 61st Street and Ellis Avenue, they observed Cisse walking with a bookbag. Defendant stated that his friend resided across the street. Then, defendant pointed at Cisse, and said, "there go dude." Walker double parked the vehicle, and Willams and defendant, who still possessed the firearm, exited. Through the rearview mirror, Walker observed defendant and Williams approach Cisse. Defendant held the firearm towards Cisse's chest, and Williams reached for his bookbag. Cisse "kept jerking [his bookbag] away," and defendant shot him. Walker left without defendant and Williams, who ran across the street toward the friend's residence. Walker later saw defendant walking with a girl and stopped the vehicle. Bracey and defendant conversed, and defendant stated that he was not leaving without Williams.

¶ 8    On November 26, 2007, Walker was "severely" beaten by defendant and another man, suffering a swollen lip, chipped tooth, and a cut on his chin. Afterwards, defendant said that if Walker said anything, Walker "was dead." On January 11, 2008, while in the protective custody "bullpen," defendant told Walker to state that Williams was the shooter.

¶ 9    On cross-examination, Walker admitted that when he originally spoke with detectives on November 26, 2007, he stated that an individual named "Mon Mon" shot Cisse.[2] Walker spoke

---

[2] Elsewhere, this individual is referred to as Maan-Maan. In this order, for consistency, we adopt the spelling from Walker's testimony.

with David Chambers and Ernest Williams, who also knew defendant, and Chambers told him the name Mon Mon.[3] On November 27, 2007, in the presence of detectives and his mother, Walker again stated that Mon Mon was the shooter. Walker told officers that he was beaten and robbed by two men. Walker stated that because he was beaten, when he arrived at the police station, he "came up with a story" and was "throwing names." He did not know his co-offenders' names until they attended court. Walker identified an individual with an afro as the person who exited the vehicle and shot at the man who ran. Pursuant to Walker's plea agreement, he received day-for-day credit and all other charges against him were dismissed. On redirect examination, Walker stated that he told officers he made up names because defendant would look for him if he "snitched" on defendant.

¶ 10    Rodney Jones testified that on November 19, 2007, at approximately 1 a.m., he was near 53rd Street and Greenwood Avenue when "[t]wo young African American boys" exited a vehicle and approached him. The taller of the two boys displayed a firearm, and they told Jones to give them his money and credit cards, which Jones retrieved from his wallet.

¶ 11    James Rourke testified that on November 19, 2007, at approximately 12:25 a.m., he was near 60th and Woodlawn when a vehicle approached him and five "hooded" people inside the vehicle looked in his direction. When the vehicle passed him, he quickened his pace. He looked behind him and noticed the vehicle had stopped. Four of the occupants exited and approached him. Rourke ran into an open construction site and hid. He observed one of the occupants follow him and then heard a gunshot.

---

[3] Since Ernest Williams and one of the co-offenders share the same last name, we will refer to Ernest Williams by his first name.

¶ 12    Aliza Levine testified that on November 19, 2007, at approximately 1 a.m., she and Rebecca Abraham were walking on 57th Street between Ellis and University Avenue, when a "young man" tapped her shoulder and said, "give me everything you have got." Levine stated that she did not have anything and gave him a pen. Abraham gave him her wallet.

¶ 13    Adalberto Trejo testified that on November 19, 2007, at approximately 8:30 a.m., he was repairing a fence on East 62nd Street when he observed a revolver with a white handle in the grass. The police arrived and took photographs. On cross-examination, Trejo testified that he did not know how long the firearm had been there.

¶ 14    Chicago police forensic investigator Zbigniew Niewdach testified that he and his partner photographed the area on 62nd, collected a revolver, and swabbed it for DNA. When they unloaded the firearm, they noticed four live rounds, three expended rounds, and two empty slots.

¶ 15    Nashita Hudson testified that in November 2007, she resided on 61st and Ellis. Defendant was her play brother, and she did not know Bracey or Williams. She recalled a shooting on November 19, 2007, across the street from her building. She first knew there was shooting when she heard a gunshot. A few minutes later, defendant rang her doorbell and she let him in. She noticed that he was sweaty. Defendant asked her to call the police 10 to 15 minutes after he arrived, and she did. Approximately an hour later, they walked to get cigarettes. When they left Hudson's residence, there were officers outside. After Hudson and defendant obtained cigarettes, they returned to Hudson's residence and slept. She did not recall if defendant was there in the morning. Officers spoke with her on November 28, 2007, and December 20, 2007, regarding the shooting. She did not recall her statements, though she identified her signature on the written statements and photographs taken of her after giving the statements. Hudson also did not recall her grand jury testimony.

¶ 16    On cross-examination, Hudson testified that she heard the gunshot and called 911, but not prior to defendant arriving at her residence. Defense counsel then displayed Hudson's November 28, 2007, statement to police on a screen, and Hudson agreed with defense counsel regarding what her statement reflected. Hudson told officers that the gunshot was really loud and close, so she called the police. She saw police cars and an ambulance, so she went downstairs to observe. When she arrived downstairs, defendant was ringing her doorbell. They went for a walk. Defendant later asked to stay the night at her residence, and she agreed. When she woke the next morning, defendant made a call and was then picked up. Hudson stated that her November 28, 2007, statement was true. In December 2007, officers transported her to the police station and placed her in an interrogation room. Two officers entered the room and a prosecutor entered later. Hudson agreed with counsel that before the prosecutor entered, officers told her that she was a liar and in a lot of trouble. The officers used an aggressive tone that scared her.

¶ 17    On redirect examination, Hudson testified she called the police because defendant asked. Hudson did not recall anyone being aggressive with her while testifying for the grand jury. On recross examination, Hudson testified that she used drugs, including marijuana and ecstasy, which affected her memory.

¶ 18    Dr. Michel Humilier testified that while conducting Cisse's autopsy, he observed a gunshot wound to his chest and recovered a "deformed, small-caliber lead bullet" from Cisse's vertebrae. To retrieve the bullet, Humilier had to saw into the bone without an x-ray, and the bullet was sawed in half.

¶ 19    Aaron Horn, a firearm identifications expert, testified that the recovered firearm was a .22-caliber weapon with six right rifling characteristics. The three cartridge casings were fired from the recovered firearm, and the unfired cartridge was hit by the firing pin of the recovered firearm.

He could not "identify nor eliminate" that the bullet recovered by the medical examiner was fired from the recovered firearm, but noted that it was a ".22 rimfire caliber bullet" with six lands and grooves with a right-hand twist.

¶ 20    Corey Jackson testified that on January 11, 2008, he was in a cell behind the courtroom with defendant. Walker was in the protective custody cell. Defendant told Walker, "only thing you got to say is Benjamin Williams did it" and "[h]e whack dude b*** a*** off the map." On cross-examination, Jackson stated that he was testifying pursuant to a plea agreement.

¶ 21    Joshua Luciano testified that on January 11, 2008, he was in the protective custody cell behind the courtroom with Walker. Luciano heard a person in another bullpen tell Walker that they could blame "Shorty." Walker responded that he did not know "Shorty's" name, and the person said, "Benjamin Williams." The person instructed Walker to state that Williams "seen some dude he didn't like and he jumped out." Williams and the man "got into a struggle," and Williams shot him. Walker agreed. Luciano heard defendant's and Walker's names when their case was called and learned that defendant's name was Warren.

¶ 22    When Walker returned to the cell, Luciano asked him why he was incarcerated. Walker told him for murder and said they would "beat" the case because they would blame "Shorty." Walker explained that they were robbing people when they observed a man who appeared to have money. Walker stated that his "rappy" and "Shorty" exited the vehicle and grabbed the man. They struggled, and his "rappy" shot the man. Walker stated that his rappy was the "dude that [Walker] was just talking to."

¶ 23    The next day, Luciano contacted a federal agent and disclosed what he heard. After Luciano's case was dismissed, he spoke with Chicago police officers regarding what he heard. He identified Walker as the individual he conversed with. Luciano did not receive any consideration

from the Chicago Police Department, the Federal Bureau of Investigation (FBI), or the State's Attorney's Office for disclosing what he heard.

¶ 24 On cross-examination, Luciano stated that there were more than 10 individuals in the bullpen, and it was noisy. Luciano worked as an informant for Christopher Weissmantle, an FBI agent. He did not have Weissmantle speak with an assistant state's attorney (ASA) on his pending case. Luciano spoke with detectives on January 17, 2008, after his case was dismissed. Luciano did not know defendant and had never seen him or heard his voice before January 11, 2008.

¶ 25 Chicago police detective Daniel Stover testified that on December 20, 2007, he was aware of Hudson's November 28, 2007, statement. When he received the recorded 911 calls related to the shooting, he noticed that one involved Hudson, and there were inconsistencies between her written statement and the recording. For instance, her statement reflected that she heard a shot and called the police immediately, but on the recording, she stated that she heard a shot and saw someone lying on the ground. Based on the inconsistencies, Stover and Detective Timothy Murphy interviewed Hudson on December 20, 2007. When they arrived at Hudson's residence, Stover noticed that it was "physically impossible" to see where the incident occurred. They requested Hudson come to the station and she complied. They escorted her to the squad room, where they played the 911 recording. After hearing the recording, Hudson stated, "okay, you got me. Nothing else I can do but tell the truth." He did not call her a liar and was not aggressive with her. They then moved from the squad room to a conference room. Hudson was never placed in an interview room.

¶ 26 Stover recounted Hudson's statement during the December 20, 2007, interview. Hudson stated that she heard a gunshot and lay on the bed. She had no intention of calling 911. A few minutes later, defendant rang her doorbell, and she "buzzed" him in. Defendant appeared "very

afraid," was "sweating profusely," and told her to call 911. He told her that he "shot a guy out in front" and thought he killed him. He further explained that he "was trying to rob a guy" with a firearm, and when the man reached for the firearm, "[defendant] shot him." She said she put "two and two together" and realized that was the gunshot she heard. She then called 911. She also stated that she could not see the victim but was going by what defendant told her.

¶ 27 Hudson and defendant went for a walk, and defendant told her that he was with Williams and Bracey, and they were going to rob the man. Defendant and Williams exited the vehicle to commit the robbery, and Bracey was going across the street to her residence. Defendant possessed the firearm and told the man to "gimme everything you've got." The man "lunged" towards defendant to grab the firearm, and defendant jumped back and "pow, he let one go." Defendant then said Bracey entered the vehicle and the vehicle left. He and Williams separated while running away.

¶ 28 As Hudson and defendant walked, a vehicle "pulled up" containing three individuals, one being Bracey. Bracey and defendant conversed regarding Williams, and then the vehicle left. Defendant stayed the night and left the next day. Hudson spoke with defendant later that day, and he stated that he put the firearm in a lot next door and asked Hudson to retrieve it. Hudson told him that she would but explained to officers, "there's no way [she was] going around this gun *** after it's been used." Defendant called her the next day and asked if she retrieved the firearm, and she told him that she could not because it was "too hot." A few days later, defendant came to her residence and asked if she retrieved the firearm, and she said no. He also asked if she spoke with police, and she said no. Hudson stated that she gave the previous statement because she did not want to get "somebody she considered family in trouble," and she was afraid for herself. Eventually an ASA arrived.

¶ 29    On cross-examination, Stover stated that no photographs from Hudson's window were taken during the investigation. Hudson was not asked if she ever used drugs or had a memory problem due to drug usage. Hudson did not appear to be under the influence of drugs. Hudson's interview was not videotaped. ASA Karen Kerbis entered after Stover and Murphy interviewed Hudson and questioned her with Stover present. Kerbis wrote as Hudson spoke. On redirect examination, Stover stated that Hudson never mentioned drug usage or memory problems.

¶ 30    Kerbis testified that she interviewed Hudson on November 28, 2007, at Hudson's residence with Murphy present. Hudson agreed to have her statement handwritten by Kerbis. Afterwards, Kerbis and Hudson reviewed the statement, initialed any changes, and signed the bottom of each page. Kerbis then photographed Hudson and Hudson's mother.

¶ 31    On December 20, 2007, Kerbis interviewed Hudson again. Hudson explained that she had not been entirely truthful in her first statement because defendant was a good friend, and she did not want to get involved. Hudson again chose to have her statement handwritten by Kerbis. Hudson was photographed at the end of this statement. Hudson identified defendant, Williams, and Bracey in photographs. Kerbis' testimony regarding Hudson's statement was consistent with Stover's testimony recounting Hudson's statement.

¶ 32    ASA Jason Poje testified that on December 21, 2007, he presented Hudson to a grand jury. Poje published portions of Hudson's grand jury testimony, which was consistent with the statement she gave on December 20, 2007, including the identifications of defendant, Williams, and Bracey. Hudson further testified at the grand jury that defendant told her that he thought the police found the murder weapon.

¶ 33    Defense counsel called Stover to testify. Stover stated that he first interviewed Walker on November 26, 2007, at approximately 1 p.m. and then again on November 27, 2007, at

approximately 5:19 a.m. Stover told Walker that Abraham identified him in a lineup. Walker stated that he never exited the vehicle. Stover agreed with defense counsel that he told Walker that he was in "a lot of trouble," and there was evidence that he exited the vehicle. Walker said that Mon Mon was the shooter multiple times and identified Jujuan Hunt as Mon Mon. Walker was approximately 5 foot 6 inches tall, and defendant was approximately 6 foot 5 inches tall. Walker was beaten after he spoke with Chambers and Ernest. Stover called Walker a liar multiple times and accused him of lying when he stated that Mon Mon was the shooter, there was a .38-caliber firearm, and that he never exited the vehicle. Stover discussed the theory of accountability for murder with Walker and explained that Walker was equally responsible if he participated in the incidents. Walker initially stated that he was beaten by two men wearing black hoodies regarding a robbery and was asked if he had weed.

¶ 34    On cross-examination, Stover stated that Walker first identified defendant as the shooter on November 27, 2007, prior to Walker being charged. On redirect examination, Stover confirmed that Walker's mother told Walker to state that it was defendant. Though Stover accused Walker of lying, Walker insisted he was telling the truth.

¶ 35    The jury found defendant guilty of first degree murder and personally discharging a firearm that proximately caused the death of another, aggravated discharge of a firearm, and armed robbery. The trial court imposed prison terms totaling 120 years.

¶ 36    On direct appeal, this court affirmed. *People v. Warren*, 2013 IL App (1st) 113776-U. The Illinois Supreme Court denied defendant's petition for leave to appeal, but issued a supervisory order directing this court to vacate its judgment and reconsider the matter in view of *People v. Reyes*, 2016 IL 119271. *People v. Warren,* No. 117611 (Ill. Nov. 23, 2016) (supervisory order).

This court vacated its judgment, again affirmed defendant's findings of guilt, vacated his sentences, and remanded for resentencing. *People v. Warren*, 2017 IL App (1st) 113776-U.

¶ 37   At resentencing, the circuit court imposed prison sentences totaling 64 years. This court affirmed. *People v. Warren*, 2020 IL App (1st) 190688-U.

¶ 38   Defendant filed a postconviction petition on August 19, 2021, through counsel, arguing actual innocence and ineffective assistance for trial counsel's failure to present exculpatory witnesses. In support of his claim of actual innocence, defendant presented affidavits from Bracey and Williams regarding the events of November 19, 2007.

¶ 39   Williams averred that he was driving to the house of a female friend with defendant, Bracey, and Walker when Wiliams observed Cisse walking down the street. When the group reached their destination, Williams exited the vehicle and, "w/out *** [the] knowledge" of defendant, Bracey, or Walker, attempted to rob Cisse. According to Williams, Cisse resisted and Williams shot him. Williams further averred that "[n]one of the people in the car knew I would shoot *** Cisse" and they "did not discuss robbing nor did we discuss the shooting"; rather, Williams "acted alone." After the shooting, Williams "took off running."

¶ 40   Williams further attested that he pleaded guilty to murder and other offenses on December 9, 2010, in exchange for a total of 41 years' imprisonment. At his plea hearing, he stipulated to a factual basis that comported with Walker's testimony. This was false, however, and Williams only entered the stipulation to secure a lenient sentence. Subsequently, Williams regretted pleading guilty because his co-offenders "had no knowledge of what I was about to do that night." Williams was "ready and willing to take full responsibility *** by testifying at [defendant's] trial" that defendant "had no foreknowledge or involvement whatsoever of the attempted robbery and

shooting of *** Cisse." Although Williams told defendant's lawyer to call him as a witness, defendant's lawyer never contacted Williams.

¶ 41    Bracey averred that he was driving with defendant, Williams, and Walker, when defendant asked Walker to stop the vehicle so defendant could go to the home of a woman whom Bracey formerly dated. Defendant stated that he would be "real quick" and asked Walker to wait for him. Defendant sat in the front passenger seat, while Bracey sat in the backseat on the driver's side, on the side of the vehicle nearer the building. Consequently, although defendant and Bracey exited the vehicle at the same time, Bracey walked a few feet in front of defendant. During this time, Bracey "glanc[ed] back" and saw defendant.

¶ 42    As Bracey pressed the doorbell, defendant entered the building's "courtway" and Bracey heard a gunshot. Bracey and defendant ducked. According to Bracey, "Walker & *** Williams was [sic] still in" the vehicle. Defendant ran towards the vehicle, and Bracey followed. When Bracey reached the vehicle, Williams was not inside. Walker stated that Williams "got out of the car a little after" defendant and Bracey. According to Walker, Williams attempted to rob a man who was walking on the block. Walker observed the man struggle and Williams shot him. Bracey added that he "tried time & time again to tell the truth," but "everytime I tried I was told I was lying & shut out."

¶ 43    To support his claim of ineffective assistance of counsel, defendant provided a letter from trial counsel Richard S. Kling, who averred that prior to trial, he informed defendant that Williams and Bracey were represented by counsel, and if they wanted to testify, they would need to contact Kling through their attorneys. Furthermore, Kling advised defendant that he believed their testimony would be harmful to defendant's case, especially when being cross-examined by the State.

¶ 44     Defendant also attached his own affidavit averring that prior to trial, Williams stated that he would testify that he committed the murder and Bracey stated that he was watching defendant "while the murder was happening so it was impossible for [defendant] to have committed the murder." Defendant shared this information with Kling, who advised that he would "check into it."

¶ 45     The court summarily dismissed defendant's petition on November 16, 2021, finding that the petition was "frivolous and patently without merit." Regarding defendant's claim of actual innocence, the court noted that the information in Williams' and Bracey's affidavits was known to defendant before and during trial, and therefore, was not newly discovered evidence. The court recounted the trial testimony, noting that defendant attempted to establish Williams as the shooter as early as January 11, 2008. Moreover, Williams conceded during his plea hearing that defendant was the shooter.[4]

¶ 46     Regarding defendant's claim of ineffective assistance of counsel, the court initially noted that because defendant failed to raise the issue on direct appeal, it was waived. Additionally, the court noted that Kling informed defendant that he did not think Williams' or Bracey's testimony would help, especially on cross-examination. Kling also averred that he would have been ineffective if he called Williams and Bracey to testify because he knew their testimony would harm defendant more than help.

¶ 47     Defendant now appeals, arguing that he presented an arguable claim of actual innocence because Williams' and Bracey's affidavits were newly discovered evidence that was material, noncumulative, and would probably change the result on retrial. Defendant also argues that he

---

[4] The record on appeal does not contain a report of proceedings from Williams' plea hearing.

presented an arguable claim of ineffective assistance for trial counsel's failure to present exculpatory witness testimony.

¶ 48    The Act allows a criminal defendant to challenge his or her conviction for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). A postconviction proceeding occurs in three stages. *People v. Ayala*, 2022 IL App (1st) 192484, ¶ 95. The circuit court here dismissed defendant's petition at the first stage.

¶ 49    At the first stage, the court determines, without input from the State, whether the petition is frivolous or patently without merit (725 ILCS 5/122-2.1(a)(2) (West 2020)), meaning it has " no 'arguable basis either in law or in fact' " (*People v. Smith*, 2023 IL App (1st) 221496, ¶ 33 (quoting *People v. Hodges*, 234 Ill. 2d 1, 16 (2009))). A defendant need only present "the gist of a constitutional claim" with a limited amount of detail. *People v. Sparks*, 393 Ill. App. 3d 878, 883 (2009). The circuit court must liberally construe and take as true a petition's allegations at the first stage of proceedings. *People v. Jones*, 213 Ill. 2d 498, 505 (2004). If the court finds the petition to be frivolous and patently without merit, it must dismiss the petition. *Id*. We review the first stage dismissal of a postconviction petition *de novo*. *People v. Mabrey*, 2016 IL App (1st) 141359, ¶ 19.

¶ 50    To succeed on a postconviction claim of actual innocence at the first stage, a defendant must present evidence that is arguably " 'new, material, noncumulative *** [and] so conclusive it would probably change the result on retrial.' " *People v. White*, 2014 IL App (1st) 130007, ¶ 18 (quoting *People v. Coleman,* 2013 IL 113307, ¶ 96). New evidence must have been discovered after trial and could not have been discovered earlier through the exercise of due diligence. *Mabrey*, 2016 IL App (1st) 141359, ¶ 23. Evidence is material if it is "relevant and probative of the defendant's innocence" and "non-cumulative if it adds to the evidence heard at trial." *Id.* Evidence that is so conclusive to probably change the result on retrial "places the trial evidence in

a different light and undermines the court's confidence in the judgment of guilt." *People v. Robinson*, 2020 IL 123849, ¶ 56.

¶ 51    At the outset, the State maintains that defendant's freestanding claim of actual innocence is improper because he is "simultaneously using the same affidavits to support an ineffective assistance claim." See *People v. Hobley*, 182 Ill. 2d 404, 443-44 (1998) (defining a claim of actual innocence as freestanding where "the newly discovered evidence being relied upon "is not being used to supplement an assertion of a constitutional violation with respect to [the] trial" (internal quotation marks omitted)). Defendant responds that, subsequent to *Hobley*, the supreme court in *People v. Coleman*, 2013 IL 113307, provided that a petitioner may present a freestanding claim of actual innocence and allege a constitutional violation based on the same evidence. See *id*. ¶ 83 ("a freestanding actual-innocence claim is independent of any *claims* of constitutional error at trial and focuses solely on a defendant's factual innocence in light of new evidence" (emphasis added)).

¶ 52    In *People v. Martinez*, 2021 IL App (1st) 190490, an appeal from the second-stage dismissal of a successive postconviction petition, this court commented that *Hobley* "identified no principle or purpose that would be furthered by prohibiting a defendant from using the same evidence to assert both a constitutional claim of trial error and an actual innocence claim." *Id.* ¶ 102. Instead, the *Hobley* rule "would potentially force a defendant to choose to forgo a meritorious claim of trial error in order to pursue an actual innocence claim." *Id*. The court continued:

> "We also find *Hobley*'s rule to be inconsistent with the Illinois Supreme Court's more recent pronouncements on actual innocence. In *Coleman*, the supreme court *** stated that 'a freestanding actual-innocence claim is independent of any claims of constitutional error at trial and focuses solely on a defendant's factual innocence in light of

new evidence.' [Citation.] Thus, *Coleman*'s explanation of a freestanding actual innocence claim contemplates that the *claims* be independent, not that the actual innocence claim be independent of *the evidence* underlying his other constitutional claim or trial error." (Emphasis in original.) *Id.* ¶ 104.

¶ 53 *Martinez* concluded that *Hobley*'s statement that the evidence underlying the actual innocence claim not be used to support any other constitutional claim "cannot be reconciled" with *Coleman*, but "[e]ven if *Hobley*'s rule remains good law," it did not preclude the defendant from arguing actual innocence because his claim ultimately relied on evidence in addition to that underlying his constitutional claims. *Id.* ¶¶ 105-06.

¶ 54 More recently, in *People v. Mason*, 2023 IL App (1st) 220376-U, this court considered a defendant's appeal from, relevant here, the trial court's denial of his claim of actual innocence following a third-stage evidentiary hearing.[5] In rejecting the claim of actual innocence, the circuit court's comments suggested that it did not consider an affidavit that the defendant had also introduced in support of a claim of ineffective assistance of counsel. *Id.* ¶ 56. On appeal, the State maintained this was proper as that affidavit "cannot be considered in support of the petitioner's claim of actual innocence because it was used in support of the claim of ineffective assistance of counsel." *Id.* This court rejected that argument, finding "no reason to deviate" from *Martinez*'s holding that "although freestanding claims of actual innocence are independent of constitutional claims of error at trial, the evidence supporting a petitioner's claim of actual innocence need not be independent of the evidence underlying his other constitutional claims or trial error." *Id.*; but

---

[5] See Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021) (nonprecedential appellate court orders entered on or after January 1, 2021, may be cited for persuasive purposes).

see *People v. Griffin*, 2022 IL App (1st) 191101-B, ¶ 33, *pet. for leave to appeal granted*, No. 128587 (Sept. 28, 2022).

¶ 55 In the present case, defendant's claims of actual innocence and ineffective assistance of trial counsel are predicated on the affidavits of Williams and Bracey. Following *Martinez*, however, this does not preclude review of defendant's actual innocence claim.

¶ 56 Based on these affidavits, and in view of the principles that govern first-stage postconviction proceedings, we find that defendant has raised an arguable claim of actual innocence.

¶ 57 In his affidavit, Williams averred that he was driving with defendant, Bracey, and Walker when Wiliams observed Cisse walking down the street. According to Williams, he exited the vehicle and attempted to rob Cisse without the foreknowledge of defendant, Bracey, or Walker. Then, Williams shot Walker and fled.

¶ 58 Bracey, in turn, averred that he exited the vehicle with defendant, who followed Bracey to a building. Bracey observed defendant enter the building's "courtway" and heard a gunshot. Bracey and defendant ducked. At that point, according to Bracey, Walker, and Williams were still in the vehicle. Defendant then ran to the vehicle, followed by Bracey; when Bracey arrived at the vehicle, Williams was not inside. Walker told Bracey that Williams left the vehicle shortly after Bracey and defendant in order to rob a man walking nearby. When the man resisted, Williams shot him.

¶ 59 As noted, evidence is newly discovered where it was found after trial and where the defendant could not have discovered it earlier through the exercise of due diligence. *Mabrey*, 2016 IL App (1st) 141359, ¶ 23. Obviously, defendant knew of Williams and Bracey prior to trial. And, based on defendant's own affidavit, they told him they would testify that Williams committed the

murder alone and defendant, in turn, told his trial counsel. That said, the letter of defendant's trial counsel suggested that he did not communicate with either Williams or Bracey before trial and believed their testimony would have been harmful to defendant's case. Consequently, we cannot say that defendant failed to exercise diligence in producing Williams and Bracey's evidence and, therefore, we find that their affidavits are newly discovered.

¶ 60 Additionally, Williams' and Bracey's affidavits are material and noncumulative, as they are relevant and probative of defendant's innocence and no other witness testified that Williams was the shooter. *Id.*

¶ 61 The remaining issue is whether Williams' and Bracey's evidence is so conclusive as would probably change the result on retrial. As noted, evidence meets this standard if it "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 56. Probability, rather than certainty, applies in determining whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. *Coleman*, 2013 IL 113307, ¶ 97. In conducting this inquiry, "all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true," and we are "precluded from making factual and credibility determinations." *People v. Robinson*, 2020 IL 123849, ¶ 45.

¶ 62 While Williams' and Bracey's averments that Williams was the shooter are contradicted by Walker's trial testimony and Hudson's statement that defendant was shooter, our supreme court has explained that "the existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted." *Id.* ¶ 60. That is, for Williams' and Bracey's assertions to be positively rebutted, the record must affirmatively demonstrate that a "trier of fact could never

accept" the veracity of his claims. *Id.* That is not the situation here, where a trier of fact could credit Williams' and Bracey's evidence over Walker's trial testimony and Hudson's statement.

¶ 63     Our responsibility at this stage is not to weigh the evidence or make credibility determinations; instead,  we must take all allegations in the defendant's postconviction petition and supporting affidavits as true unless positively rebutted by the record. We then consider whether the defendant made an arguable showing that it is probable that the outcome of his trial would have been different. *Id.* ¶ 48. Defendant has made such a showing, as nothing in Williams' and Bracey's affidavits is positively rebutted by the record. Consequently, we must accept the contents of their affidavits as true, and, given the substance of their affidavits, we find that they place the trial evidence in a new light and undermine confidence of the finding of guilt. See *id.*

¶ 64     Defendant also contends that he presented an arguable claim of ineffective assistance for trial counsel's failure to interview Williams and Bracey. However, we need not address this issue since we have already found that defendant has met his burden in raising an arguable claim of actual innocence. As such, defendant may proceed to the second stage of postconviction proceedings with his entire petition. See *People v. Romero,* 2015 IL App (1st) 140205, ¶ 27 ("If a single claim in a multiple-claim postconviction petition survives the summary dismissal stage of proceedings under the Post–Conviction Hearing Act, then the entire petition must be docketed for second-stage proceedings regardless of the merits of the remaining claims in the petition.").

¶ 65     Accordingly, we reverse the summary dismissal of defendant's postconviction petition and remand for second-stage proceedings.  We deny the defendant's request that this case on remand be assigned to a different judge.

¶ 66     For the foregoing reasons, the judgment of the circuit court of Cook County is reversed.

¶ 67     Reversed and remanded.

¶ 68   JUSTICE OCASIO, specially concurring:

¶ 69   I join in the decision of the court. I write separately only to address Warren's request that we order that his case be assigned to a different judge on remand.

¶ 70   In its summary-dismissal order, the trial court stated that "the content of the affidavits [sworn out by Williams and Bracey] are precarious and questionable at best, and the information contained in the affidavits is purely circumstantial." Warren argues that this statement shows that the trial court has prejudged the credibility of Williams and Bracey.

¶ 71   An essential element of an actual-innocence claim is that the new evidence be "of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47. It appears from the trial court's written order that it attempted to make that determination by assessing the weight that might be given to the affidavits in light of the evidence presented at trial. Our decision succinctly explains why that approach was legally erroneous. *Supra* ¶¶ 61-63.

¶ 72   In short, the trial court's statement reflects a good-faith—albeit premature—effort to evaluate whether Warren's actual-innocence claim could be sustained, not a prejudgment of the credibility of either Williams or Bracy should this case proceed to an evidentiary hearing. I have every confidence that, on remand, that will not impair the trial court's ability to keep an open mind.